221 F.2d 366
 SEABOARD SURETY COMPANY, Appellant,
v.
PERMACRETE CONSTRUCTION CORP.; James A. Gannon, George B.
Gay, George H. Weinrott, Thomas B. Smith Company,
Davis P. Smith.
SEABOARD SURETY COMPANY, a corporation,
v.
PREMACRETE CONSTRUCTION CORPORATION, James A. Gannon, George
B. Gay, George H. Weinrott, Thomas B. Smith
Company, Davis P. Smith, Thomas B. Smith
Company and Davis P. Smith, appellants.
 Nos. 11398, 11436.
 United, states Court of Appeals, Third Circuit.
 Argued Feb. 8, 1955.
Decided March 22, 1955.
Rehearing Denied in No. 11436 April 14, 1955.
 
 Harry Norman Ball, Philadelphia, Pa. (Morris L. Weisberg, Philadelphia, Pa., on the brief), for Thomas P. Smith Co. and another.
 Daniel Mungall, Philadelphia, Pa. (Seth W. Watson, Jr., Philadelphia, Pa., on the brief), for Seaboard Surety Co.
 Thomas E. Comber, Jr., Philadelphia, Pa. (Francis E. Shields, Pepper, Bodine, Frick, Scheetz & Hamilton, Philadelphia, Pa., on the brief), for George B. Gay.
 Before GOODRICH, McLAUGHLIN and HASTIE, Circuit Judges.
 GOODRICH, Circuit Judge.
 
 
 1
 This is an action for damages for an alleged fraud perpetrated upon the plaintiff surety company by what the plaintiff claims is the whole group of defendants who are joined in this action. A jury returned a verdict for the plaintiff for $40,000 which is considerably less than the amount claimed. The trial judge refused to interfere with the verdict except in the case of one defendant whose name is George B. Gay. Davis P. Smith and Thomas B. Smith Company, here referred to as a single defendant, appeal from the judgment. The trial judge set aside the verdict against George B. Gay and entered judgment in his favor. The plaintiff appeals from that judgment. There are, as thus explained, two appeals. But since they both grow out of the same set of operative facts we are treating them together in one opinion.
 
 Factual Background
 
 2
 Smith says there is no basis for a judgment against him. In spite of a very elaborate argument made on his behalf we think he is wrong and think that the argument has made out of the case a much more complicated problem than it really is.
 
 
 3
 Perhaps some of this complication came through the effort to inform the court of all the background which led up to the litigation. The district judge summarized it briefly and accurately in his opinion overruling defendants' motions for judgment or a new trial.[1] We can, at this stage of the case, shorten the statement even more.
 
 
 4
 The lawsuit rose out of the failure of a building project which was to be carried out in Front Royal, Virginia. One of the defendants, Permacrete Construction Corporation, was the maker of prefabricated concrete pieces out of which a series of houses was to be built. The company for whom they were to be built was called Shenandoah Valley Housing Corporation. Federal Housing Authority and Reconstruction Finance Corporation were both involved in the general plan but not in any way which affects us here. Permacrete, the construction contractor, was required to give the ordinary contractor's performance bond.[2] It is at this point that the alleged fraud comes in. Permacrete had no assets but hope and expectation, yet they were entering upon a construction project that obviously required a considerable amount of cash outlay. There were two sets of representations.[3] One was to Shenandoah. Shenandoah was told that in order that a bond be forthcoming it must advance a good sized sum of money to Permacrete to get the building project under way. This it did. The second set of representations was, it was alleged and necessarily found, to the plaintiff surety company. This company had, since the very beginning of negotiations, insisted that Permacrete must have a large amount of cash on hand, not subject to debts, which could be used and which Permacrete would promise to use in carrying out the building plan. This could be cash capital and surplus or undistributed profits except of course there were no undistributed profits because Permacrete was a newly formed corporation.
 
 
 5
 This plan succeeded much better than the plans for building houses. Acting on the representation that a bank deposit made in a Philadelphia bank was unincumbered capital and surplus, the plaintiff company wrote the performance bond. The building venture folded without a single house having been built. Shenandoah sued the surety company upon the bond and the suit was settled for $35,000. Thereupon the surety company sued these defendants seeking to recover three items: (1) the $35,000 paid to Shenandoah in settlement, (2) $25,000 counsel fees incurred in the investigation and preparation for trial in the suit by Shenandoah against the surety company, and (3) miscellaneous cash outlay of $2,479.92.
 
 The Smith Appeal
 
 6
 We need not trouble ourselves with the liability of Permacrete, Gannon or Weinrott. They have not appealed. But Smith urges vigorously that there is insufficient testimony to connect him with any fraud. Smith acted as a broker; his only stake was his broker's fee. Contrary to Smith's assertions however there is evidence which, if accepted by the trier of fact, ties him to the transaction by which the surety company was deceived.
 
 
 7
 It is not alleged that Smith himself made directly to the plaintiff any representations at all.[4] The case, from the plaintiff's point of view, against Smith is this: If witnesses testifying for the plaintiff spoke accurately, Smith was informed about the advance by Shenandoah to Permacrete. Smith, according to this testimony, also knew that it was being represented to the plaintiff that the money in the Philadelphia bank, the amount of which was verified by one of Seaboard's representatives, was unincumbered capital and surplus. If the testimony about Smith's knowledge is believed, then Smith knew it was not unincumbered capital and surplus but an advance from Shenandoah which was in turn secured by false statements to that company. Whether Smith's knowledge alone would impose liability upon him might present a hard question in view of Morrow v. Wilson, 1920, 266 Pa. 394, 109 A. 632; but we need not be concerned with that problem because the charge against Smith is that, knowing of the inaccuracy of the statement, he participated in the fraud by forwarding the statement to the surety company in order to induce its action.
 
 
 8
 Indeed, the case against Smith can be strengthened beyond this. There is testimony of the witnesses, Allman and Davis, the ones who explained how Smith knew all about the transaction, that (1) Smith participated in making representations to Shenandoah that Seaboard required the advance, and (2) that Smith represented himself to Allman and Davis as agent for the plaintiff, Seaboard.
 
 
 9
 If this testimony is accepted we do not need to resort to language describing 'conspiracy' at all. What we have is a group of people charged with having committed a joint tort. If they in fact did do all these things together pursuant to a common plan, they are joint and several tort-feasors and can be held jointly or severally liable without any doubt. See Restatement, Torts, 875 et seq.
 
 
 10
 The district judge realized all this. The defendants asked for a charge:
 
 
 11
 'A conspiracy to defraud on the part of two or more persons means a common purpose supported by a concerted action to defraud, each having the intent to defraud and each understanding that the other has that purpose.'
 
 
 12
 The trial judge told the jury that the statement was correct but added, 'I don't think it matters very much whether you call this plan a conspiracy or not. I have stated broadly that if there was a plan and Smith knew about it and participated in it by transmitting this information, then he could be held liable if the other elements are present.' We completely agree.
 
 
 13
 Did the trial judge put the problem fairly to the jury so that it understood the question which confronted it in arriving at a verdict against all the defendants? The charge is a pleasure to read. In the early part of it the court tells the jury what is necessary to recover in an action for deceit. It is done so concisely that it is best to quote the language instead of paraphrasing it. He said:
 
 
 14
 '* * * the things the plaintiff who is seeking to recover in an action of this kind has to prove are that a representation was made to it of some fact; that it was a material representation; that it was false; that it was made by the defendants with the knowledge that it was false and with the intent that the plaintiff should act upon it; that the plaintiff did not know the fact, but relied on whatever information was given it; that it had a right to rely on it and that in so doing plaintiff was injured as a result of its reliance.'
 
 
 15
 Later in the charge he covers the point about Smith very precisely. He says:
 
 
 16
 '* * * if Smith knew of the plan to get the bond by representing what was really an advance payment on the contract as capital and, with the knowledge that that representation was false, participated in this plan by forwarding that information without disclosing its falsity to the surety company and he could be held liable if the company relied on that information and suffered damages as a result of its reliance.'
 
 
 17
 Again a little later he says, 'The burden is on the plaintiff to establish the facts. In order to hold Smith liable in this case you must find that he knew about this whole setup, knew what they were going to do, knew why they were going to do it and that he forwarded this information knowing that it was not correct * * *. Do you believe them (the witnesses Allman and Davis) or do you believe Mr. Smith? There is your problem. You have to determine it; I can't help you with it.'
 
 
 18
 And even further the court again emphasizes the question about Smith's liability to the jury.
 
 
 19
 'If Smith did not know anything about the real state of this case; if he thought this money was capital, then I don't find anything in the case which would allow you to bring in a verdict against him. If however he knew that it was not capital and knew that it was an advance, then you could find that his transmitting that information without putting the surety company on notice was a participation in this plan and that it involved what the law describes as deceit and would make the party responsible.'
 
 
 20
 If the English language can make a charge to the jury plain and emphasize to that body the precise question it must answer, this charge seems to us to do it. As pointed out above there was testimony which, if believed, would support the conclusion which the jury reached. We do not seek how in a trial by jury any more exact justice than this can ever be attained.
 
 
 21
 There are two other incidental questions in connection with the liability of the defendants. One has to do with reliance. The court put that to them clearly and even raised a problem to the jury as to whether one would rely upon a representation that a company had a thousand dollars in capital and $170,000 in surplus and undivided profit.[5] The jury was instructed clearly on the problem. As to any legal propositions involved, it is clear that the representations made by the defendants do not have to be the sole cause of the plaintiff's reliance to his damage. Restatement, Torts, 546; Neuman v. Corn Exchange Nat. Bank & Trust Co., 1947, 356 Pa. 442, 454, 51 A.2d 759, 765, 52 A.2d 177.
 
 
 22
 Finally, there is the question of damages. Plaintiff complains of $35,000 which was paid to settle the Shenandoah suit. That was all talked over and passed upon by the jury. It appeared from the testimony of Mr. Stevens, who was handling the matter at that time for Seaboard, that it would have cost about $25,000 to have defended the lawsuit, even with a good defense. Further this, like any other lawsuit, was subject to risks that could not be accurately determined in advance. That was all explained to the jury and put to them under proper instructions. We find no error.
 
 
 23
 Complaint is also made because the jury was allowed to consider Seaboard's counsel fees as an item of its damage. There is cited to us the well known rule that in general counsel fees between a plaintiff who is asserting a claim and a defendant who is resisting it are not recoverable. Blum v. William Goldman Theatres, 3 Cir., 1947, 164 F.2d 192, 198 (and authorities cited therein). But this is not that case. This is a case where the plaintiff is seeking to recover money spent in investigating a claim made by a third party. The language of Section 914, Restatement, Torts is expressly on the point. It says:
 
 
 24
 'A person who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover compensation for the reasonably necessary loss of time, attorney fees and other expenditures thereby suffered or incurred.'
 
 
 25
 We have been cited to several cases on this point. The Pennsylvania references are not helpful.[6] But the friendliness of the Pennsylvania courts to the Restatement of Torts is a matter of record[7] and the proposition stated in the Restatement is also found in other general works. See, e.g., 15 Am.Jur., Damages, 144 (1938); McCormick on Damages, 67 (1935). We think that defendant's point is not well taken.
 
 
 26
 We have had no help from counsel on the problem of orienting our legal discussion to state law. This is a diversity case and our obligation to follow state law is now too well established to require citation to support. The misrepresentation took place in Philadelphia. It is likely that the surety bond was a Virginia contract. It was forwarded for execution in Virginia and seems there to have been delivered. Where did the plaintiff's losses occur? We do not know where Seaboard paid Shenandoah nor do we know where the money was paid out which Seaboard suffered as a consequence of being deceived. All these gaps do not become critical in this case. What we have is an application of the well-settled rules of deceit to a conflicting fact situation. We think that we, as well as a Pennsylvania state court, are entitled, after making sure that the fact problems are understood by the trier thereof, not to worry about possible diversions from well accepted law by any state whose law might be concerned.
 
 
 27
 As to Thomas B. Smith Company and Davis P. Smith, appeal numbered 11,436, the judgment of the district court will be affirmed.
 
 The Seaboard Appeal
 
 28
 This appeal presents difficulties not present in the Smith appeal just discussed. Here we do not have a controversy which the trier of the fact can settle by concluding that A is telling the truth and B is not. Here, rather, our problem is twofold. The first is to determine whether the evidence against the defendant George B. Gay is sufficiently strong to tie him into the plan to defraud the plaintiff. The jury's verdict necessarily must have found that the defendant had been a party to misrepresentations in such a way that he became liable under the test for liability which the court gave the jury with regard to all the defendants. The second question is to determine whether the court erred in not allowing the jury to consider, as part of the plaintiff's case for deceit, evidence concerning Gay's participation after the delivery of the bond.
 
 
 29
 The essence of our question on this appeal as to the first problem is distilled in the following paragraph from the opinion of the district judge.
 
 
 30
 'In order to hold Gay liable, two things would have to be shown by clear and convincing evidence, first, that he knew that representations were being made that Permacrete had $170,000. of surplus and cash capital, second, that Permacrete did not have and did not intend to have $170,000. cash capital and surplus. That he knew the first fact can be assumed from his signing of the letter so certifying. There is no proof that he knew the second. There is so little evidence as to just what his participation in the enterprise was that the jury could not properly have found that he must have known about the way in which the money was obtained by Permacrete in order to make a showing of having met the plaintiff's requirements.'
 
 
 31
 Let us, therefore, review briefly any part which Gay may have been shown to have played in this drama. Here it must be kept in mind that, since the verdict was against him, facts and inferences therefrom which appear in the testimony must be taken in favor of the plaintiff.
 
 
 32
 Plaintiff finds seven items which it says are sufficient to establish a case against George B. Gay. They are as follows:
 
 
 33
 1. There is testimony from Smith that Gay visited Smith's office in 1947, April or May. Smith said that Gay said he was going to be responsible for the capital of Permacrete. This to our minds is perfectly neutral testimony. All it proves is that, if believed, Gay had some connection with the Permacrete enterprise.
 
 
 34
 2. July 28, 1947, Gay gave Weinrott his personal check in the amount of $10,000 payable to the order of Permacrete Construction Corporation. This check was in fact used with the cashier's check of the Peoples National Bank of Rocky Mount for $160,000 to establish the Permacrete account in a Philadelphia bank. But so far as attributing dishonest purpose to Gay is concerned, it proves nothing at all. We have at most a delivery of a check to Weinrott to Permacrete's order. There is not the slightest indication of anything dishonest on Gay's part in this.
 
 
 35
 3. On July 29, 1947, Parker, Seaboard's agent in Philadelphia, received, along with a financial statement signed by Gannon concerning Permacrete, a letter signed by Permacrete through Gannon, and by Gannon and Gay individually, that $170,000 in Permacrete's account represented capital and surplus. This item will be discussed later.
 
 
 36
 4. There was testimony from the witness, Allman, that he met Gay in Philadelphia early in 1948, that Gay apparently knew that things were not going well with Permacrete and that he, Gay, had agreed to 'push the thing.' This is certainly not probative of any dishonesty on Gay's part in the summer of 1947. There was testimony that Gay was familiar, as of the winter of 1948, with the entire transaction. But, at most, if one concludes that such familiarity tended to show that Gay at this time knew of irregularities made in statements months before, it is too remote to tie him to any misrepresentations made the previous summer.
 
 
 37
 5. Mr. Lewis M. Stevens, then representing Seaboard, had a talk with Gay in his office in June, 1948. Gay told Mr. Stevens that the $170,000 shown on the financial statement of Permacrete was not the same as the $160,000 which had been advanced by Shenandoah. He also told Mr. Stevens that he, Gay, had put most of the money into Permacrete.
 
 
 38
 There is an innocent explanation offered by the defense for these statements. It seems that there was a New Jersey Permacrete corporation, wholly a manufacturing concern. Gay had a heavy investment in this, and says it was this corporation he meant when he talked to Mr. Stevens. But after a verdict we must take the evidence most strongly against the unsuccessful litigant. Even then this evidence is but confirmatory of the statement of fact made in what we have listed under item 3 above. It has no independent value.
 
 
 39
 6. On February 25, 1948, George B. Gay was made the promisee of an agreement made by Gay, Weinrott, Gannon and Fleming that all the stock of Permacrete was to be issued to Gay. The contract recited that it was made pursuant to an earlier oral agreement.
 
 
 40
 Plaintiff insists that this is significant. We find no significance in it whatever on the question whether Gay deceived Seaborad. It does seem to show Gay's connection with the company but that is a long way from showing that an investor in a project knows all the machinations of those actively in charge.
 
 
 41
 7. The last item urged by the plaintiff is that Permacrete's stock certificates endorsed in blank were in Gay's possession. If this were an action for conversion of the stock certificates this evidence would be highly relevant. But it does not prove a thing in an action for deceit against Gay by Seaboard.
 
 
 42
 We agree with the district court that the evidence is too slender a thread on which to hang liability upon Gay upon the theory that he participated with the other defendants in a plan to defraud the plaintiff.
 
 
 43
 Now we turn to the second question. It is quite obvious that the one item with which we must wrestle is that statement of July 29, signed by Gay, Gannon and Permacrete that the $170,000 represented capital and surplus. The trial judge told the jury it could consider that statement made on July 29, which was after the bond had been delivered, 'to determine whether the plan was as the plaintiff has outlined it to you and contends that it was and whether Gay was connected with it * * *.' He told the jury that it could not consider the financial statement as part of the case for deceit because the bond had already been delivered prior to the day that statement was put in Parker's hands.
 
 
 44
 A short recapitulation of the events immediately before and after delivery of the bond will be helpful. From the very beginning of the negotiations between Smith, broker for Permacrete, and Parker, Philadelphia agent for Seaboard, it was made perfectly clear that the surety company was going to insist that Permacrete have cash on hand not subject to indebtedness which it could apply and would promise to apply to this construction job.[8] This first comes out in communications of February 20, 1947, and in a letter of February 27, 1947, from Parker to Smith the surety company's acceptance is made conditional on there being no liabilities other than the capital stock 'as outlined in your letter of February 20th last.' This insistence appears throughout all the correspondence among the various parties and is reiterated once more in Parker's letter to Smith of May 2nd and again in his letter of July 3rd.
 
 
 45
 High command can map out strategy but field tacticians do not always carry it out. Parker had, as instructed by superiors, talked all along about the necessity of a financial statement, free and clear money, inspection of bank deposits, all as a condition to delivery of the bond. But Parker did in fact deliver this bond to Smith before receiving the financial statements, before receiving the letter signed by Gay, and before he inspected the bank deposit. Parker's delivery to Smith, however, was upon condition that Smith would not deliver the bond until Parker had received the above information. Smith, like Parker, delivered the bond before the information was received. The record shows quite clearly that Weinrott delivered the bond to Shenandoah in Richmond, Virginia, on July 25, 1947. Upon delivery of the bond, Shenandoah delivered its check for $160,000 to Weinrott. This check and the check from Gay for $10,000 made up the $170,000 which was represented to Seaboard as cash capital and surplus. Finally, on July 29, 1947, Permacrete's financial statement was prepared, the letter from Permacrete, Gannon and Gay was signed, these items were delivered to Parker, and Parker verified the bank deposit.
 
 
 46
 On August 15, 1947, Parker wrote Mr. R. M. Smith in New York who was Vice President of Seaboard. In that letter he stated that the bond was delivered on July 29th, 'after verification of the bank account was made.' As already stated, the statement in this letter is not borne out by the evidence. It appears that Parker, who was, from the familiarity of the correspondence between them, on friendly terms with Smith, delivered the bond before performance of the conditions that he and his superiors had been insisting on all the time.
 
 
 47
 Following this chronology we are confronted with three questions. The first is a question of law which must be settled first. Otherwise the fact situation has no significance. What is the Pennsylvania law as to liability of one who makes an untrue statement of fact under the circumstances in which Gay joined with Gannon in making a statement of fact to Seaboard?
 
 
 48
 Restatement, Torts, Section 526[9] states the rule as follows:
 
 
 49
 'A misrepresentation in a business transaction is fraudulent if the maker
 
 
 50
 '(a) knows or believes the matter to be otherwise than as represented, or
 
 
 51
 '(b) knows that he has not the confidence in its existence or non-existence asserted by his statement of knowledge or belief, or
 
 
 52
 '(c) knows that he has not the basis for his knowledge or belief professed by his assertion.' Illustration 1. to Comment f. in this same section is significant enough to be worth quoting here:
 
 
 53
 '1. A states to B that C's financial position is such as to justify B in giving him credit in a particular sales transaction. A knows that B will understand that the statement is based upon A's personal dealings with C. In fact A has had no such dealings with C but has heard from what he regards as reliable sources that C's financial position is first rate. C being insolvent B is unable to collect his debt from him. A is liable to B for the loss which B suffers through relying upon his statement if the circumstances justify his reliance upon A's supposed personal knowledge.'
 
 
 54
 The Pennsylvania decisions are consistent with the statement of law in the Restatement. Bokee & Co. v. Walker, 1850, 14 Pa. 139; Duff v. Williams, 1877, 85 Pa. 490; Erie City Iron Works v. Barber & Co., 1884, 106 Pa. 125, 139; Griswold v. Gebbie, 1889, 126 Pa. 353, 17 A. 673; Lamberton v. Dunham, 1895, 165 Pa. 129, 30 A. 716; Warren Balderston Co. v. Integrity Trust Co., 1934, 314 Pa. 58, 170 A. 282. The following from Hexter v. Bast, 1889, 125 Pa. 52, 17 A. 252, 253 is worth quoting:
 
 
 55
 'The general rule is that to support an action of 'deceit,' properly so called, it must appear that the fraudulent representation complained of was untrue; that the defendant knew, or ought to have known, at the time it was made that it was untrue; that it was calculated to induce the plaintiff to act upon it; and that, believing it to be true, he was induced to act accordingly. Cox v. Highley, 100 Pa.St. 249. As a general rule, the statement must be both false and fraudulent; but if a person take upon himself to state, as true, that of which he is wholly ignorant, he will, if it be false, incur the same legal responsibility as if he had made the statement with knowledge of its falsity. The fraud consists in representing that he knows that of which he in fact is consciously ignorant.'
 
 
 56
 So much for the rule of law.
 
 
 57
 The second question is whether the plaintiff is in a position at this stage to raise the question of whether it was entitled to have a jury pass upon the question of its reliance on the Gay letter. It appears that the plaintiff asked for instructions to the jury as follows:
 
 
 58
 '11. If you find that Gannon and Gay, or either of them, knew, when they signed the July 29, 1947 letter, that the $170,000 cash in bank was not capital and surplus of Permacrete, then whichever of them you find had such knowledge is liable to the plaintiff for any damages resulting from its reliance on that letter.
 
 
 59
 '12. If you find that Gannon and Gay, or either of them, did not know, at the time they signed the July 29, 1947 letter, whether or not the $170,000 cash in bank was capital and surplus, then whichever of them did not have such knowledge is liable to the plaintiff for any damages resulting to the plaintiff from reliance upon that letter.'
 
 
 60
 These instructions were refused by the trial court and, just to clinch the matter although it was not necessary, the plaintiff excepted and the court allowed the exception. This of course was unnecessary under the rules but it seems to bring out the fact that the point was made and insisted on by the plaintiff. As proved by the citations above, the plaintiff was entitled to have the jury instructed in accordance with these requests.
 
 
 61
 Now we come to the third and last question. How could there be reliance on anything which Gay told the plaintiff since the bond had already been delivered when he did the telling? The answer is there are quite a number of things. Seaboard, not unlike other companies in the same business, had provisions in its contract to protect itself. One consisted of an assignment from Permacrete to Seaboard to become effective under certain conditions. Another possibility was immediate rescission for fraud had the facts been known. We do not need to outline for the aggressive counsel for the plaintiff corporation all the things which would have been available to it while the whole situation was in the fluid condition that it was before final financial statements, checking of bank account and so on were still to be done and before anything had been started by Permacrete on the contract the performance of which the bond guaranteed. In other words, here was a situation where had facts become known the whole picture could have changed very rapidly. As already stated several times, one of the conditions which Seaboard had laid down was the statement about this money on hand and its freedom from debt claims. This statement was to be signed by Gay and others. If Gay had not signed the statement then the conditions for delivery of the bond would not have been fulfilled. Seaboard could have then and there stopped the whole business.
 
 
 62
 We think the plaintiff was entitled to have the judgment of the trier of fact upon the question of its reliance on the liability-creating statement made by the defendant, Gay. That is the only place in the case where we disagree with the learned trial judge. But it is enough to compel a remand in the Seaboard appeal and a new trial on the question just stated.
 
 
 63
 In Seaboard's appeal, number 11,398, the judgment will be reversed and the case remanded to the district court for further proceedings not inconsistent with this opinion.
 
 
 
 [1]
 130 F.Supp. 184
 
 
 [2]
 There were actually two separate contracts and two bonds, but we shall treat the case as if there was only one transaction, as did the district court, because the same facts are involved in reference to each bond and it simplifies the discussion without affecting the result
 
 
 [3]
 There was a dispute on facts all the way through at the trial but since the verdict was for the plaintiff we are justified in making our resume here in terms of what the plaintiff's evidence tended to show and what the jury must necessarily have found to be true
 
 
 [4]
 There is, however, one bit of testimony by Smith himself to the effect that he told Parker 'that they (Permacrete) had $170,000 cash capital.'
 
 
 [5]
 The court's charge on this point was as follows: 'The defendants want you to consider and it is proper that you should consider whether a bonding company really would reply on that information when the setup as shown to them appears to be such an unusual one; namely, $1,000 of capital of a new company, then $170,000 of surplus and undivided profits. It is an unusual situation, yet the bonding company's men testified that there is no reason why parties can't put any amount of money into a concern and call it surplus. It doesn't matter whether you call it surplus or whether you call it capital stock. At any rate, that is something to consider on the question of whether the bonding company really did rely on these statements or whether they had a right to rely on them.'
 
 
 [6]
 Although the Pennsylvania cases are not exactly on point, they indicate that Pennsylvania does recognize exceptions to the general rule by allowing counsel fees to be recovered as damages in certain tort cases. See Barnett v. Reed, 1865, 51 Pa. 190 (counsel fees incurred in defending against malicious proceedings recoverable); Shumaker v. Hankey, 1946, 158 Pa.Super. 602, 45 A.2d 910 (counsel fees incurred in a suit to recover for excessive distraint are proper items of damages). In Blum v. William Goldman Theatres, 3 Cir., 1947, 164 F.2d 192, 198, this Court refused to allow counsel fees as damages pointing out that the plaintiff there had not alleged 'expenses incurred in other litigation.'
 
 
 [7]
 See Florey, The Restatement of Torts in Pennsylvania 1939-1949, 22 Pa.B.A.Q. 79 (1950)
 
 
 [8]
 The original conversations had to do with a smaller bond, based upon a smaller undertaking in the house building line than was subsequently arranged for. But the insistence of the surety company was the same for both the smaller and the more ambitious project
 
 
 [9]
 This Section, as well as Section 525 of the Restatement, Torts, was cited with approval by the Pennsylvania Supreme Court in the recent case of Neuman v. Corn Exchange Nat. Bank & Trust Co., 1947, 356 Pa. 442, 51 A.2d 759, 52 A.2d 177