In the Matter of the Interception of Telephone Communications of Anonymous.

Supreme Court, Special Term, New York County, January 10, 1955.

Hofstadter, J. Application is made to me for an order permitting the interception of telephone communications over a line specified in the proposed order submitted for my signature. The purpose of the requested interception as stated in the papers in support of the application is to secure evidence of the commission of the crime of book-making. The application now made follows the general pattern of like applications heretofore made to me, which also, in the main, had as their objective the detection of gambling in some form. Though I have in the past signed such orders, I have done so with much misgiving. Prompted by this misgiving, I devised certain expedients as a curb on excessive or unwarranted resort to such orders.

Some years ago I instituted the requirement that every application to me for an interception order be supported by the indorsement of an officer of rank in the police department and that written reports of the results obtained from any interception order be thereafter submitted to me. Even with these restrictions, I have granted the orders with reluctance. The reports received by me instead of allaying my anxiety, merely deepened it. These showed some arrests and fewer convictions and then rarely, if ever, for a heinous offense. The sense of uneasiness born of this situation as well as the current discussions of wire tapping has led me to give the problem further study.

The application is made under a provision of the Constitution of this State and a statute implementing it. After intense and prolonged debate the constitutional convention of 1938 adopted the following provision, now part of section 12 of article I of the Constitution: " The right of the people to be secure against unreasonable interception of telephone and telegraph communications shall not be violated, and ex parte orders or warrants shall issue only upon oath or affirmation that there is reasonable ground to believe that evidence of crime may be thus obtained, and identifying the particular means of communication, and particularly describing the person or persons whose communications are to be intercepted and the purpose thereof."

The statute is section 813-a of the Code of Criminal Procedure, effective in 1942. So far as here material it reads: " An ex parte order for the interception of telegraphic or telephonic

communications may be issued by any justice of the supreme court or judge of a county court or of the court of general sessions of the county of New York upon oath or affirmation of a district attorney, or of the attorney-general or of an officer above the rank of sergeant of any police department of the state or of any political subdivision thereof, that there is reasonable ground to believe that evidence of crime may be thus obtained and identifying the particular telephone line or means of communication and particularly describing the person or persons whose communications are to be intercepted and the purpose thereof. In connection with the issuance of such an order the justice or judge may examine on oath the applicant and any other witness he may produce for the purpose of satisfying himself of the existence of reasonable grounds for the granting of such application.'' I am not confronted with the use as evidence of the fruits of wire tapping; the sole question I am concerned with is whether the wire tapping itself should be allowed.

A review of the pertinent decisions shows that in New York there is no limitation on the use of wire-tap evidence. In accordance with the weight of authority in this country, the New York rule has consistently been that evidence is admissible, however tainted its source, and though obtained through violation of law. (*People* v. *De Fore,* 242 N. Y. 13.) Nor has the prohibition of unreasonable search and seizure introduced into the State Constitution in 1938 (art. I, § 12) — before 1938 the prohibition was to be found only in the Civil Rights Law (§ 8) — altered this rule. An article seized in defiance of the constitutional provision may still be received in evidence. (*People* v. *Richter's Jewelers,* 291 N. Y. 161.)

Unauthorized telephone interception is a crime in this State. (Penal Law, §§ 552, 1423, subd. 6.) Yet, unlawful wire taps may be received in evidence. (*Matter of Davis,* 252 App. Div. 591, 598; *People* v. *McDonald,* 177 App. Div. 806, 809–810.) Even since the adoption of the 1938 Constitution, it has been held that wire-tap evidence is admissible, though the order authorizing the interception is void or irregular. (*People* v. *Katz,* 201 Misc. 414.)

The decisions of the Federal courts in no way impair the authoritative effect of the foregoing rulings. Not alone do the Fourth and Fifth Amendments to the United States Constitution, which proscribe unreasonable search and seizure and self-incrimination, not operate on the States (*Twining* v. *New Jersey,*

211 U. S. 78, 92–93), but the Supreme Court has held that the tapping of telephone wires and the use of the resultant wire-tap evidence do not violate either of these amendments. (*Olmstead* v. *United States*, 277 U. S. 438.) The later cases in the Supreme Court, in some of which intercepted telephone conversations and evidence derived from them have been excluded in the Federal courts, deal mainly with the interpretation of section 605 of the Federal Communications Act. (U. S. Code, tit. 47; *Nardone* v. *United States*, 302 U. S. 379; *Nardone* v. *United States*, 308 U. S. 338; *Weiss* v. *United States*, 308 U. S. 321; *Goldstein* v. *United States*, 316 U. S. 114; *Goldman* v. *United States*, 316 U. S. 129.)

Despite the ruling in *Weiss* v. *United States* (308 U. S. 321, *supra*), that section 605 of the Communications Act extends to intrastate communications, our courts have uniformly held that the section does not forbid the reception in evidence by them of the fruits of wire taps obtained in compliance with section 813-a of the Code of Criminal Procedure. (*Matter of Harlem Check Cashing Corp.* v. *Bell*, 296 N. Y. 15; *People* v. *Stemmer*, 298 N. Y. 728, affd. *sub nom. Stemmer* v. *New York*, without opinion by evenly divided court, 336 U. S. 963, rehearing denied, 337 U. S. 921; *People* v. *Feld*, 305 N. Y. 322, 329–330; see, also, *Black* v. *Impellitteri*, 201 Misc. 371, affd. 281 App. Div. 671, appeal dismissed 305 N. Y. 724.) Any inconclusive effect which might perhaps be attributed to the Supreme Court affirmance of the *Stemmer* decision by an evenly divided court, seems to have become academic. For, in *Schwartz* v. *Texas* (344 U. S. 199, 203), the court held that interceptions obtained in violation of section 605 of the Federal Communications Act may nevertheless be received in evidence in a State court. In the court's opinion, the Federal act was not intended to impose a rule of evidence on the State courts.

It thus becomes obvious that the fruits of telephone interceptions made pursuant to an order under section 813-a of the Code of Criminal Procedure can successfully withstand legal attack and may be received in evidence in the courts of this State without let or hindrance.

The very immunity so given to the wire taps is alarming. The question before me now, however, is not the use which may be made of the fruits of an accomplished interception, but whether the interception itself should be authorized in the first place. Whatever the purpose of the interception, the stark fact remains that it is an intrusion on the right of privacy. Justice HOLMES in his dissent in the *Olmstead* case referred to

wire tapping as " dirty business " (277 U. S. 438, 470). Justice Roberts in the first *Nardone* case called it " inconsistent with ethical standards and destructive of personal liberty " (302 U. S. 379, 383).

Nor can we forget the words of Justice Brandeis in his memorable dissent in the *Olmstead* case: " The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfaction of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone — the most comprehensive of rights and the right most valued by civilized men." (277 U. S. 438, 478.) This expression is an accurate appraisal of human values and of the things men hold dear in life. These are concepts not to be brushed aside when judicial action is invoked by which a realm, ordinarily inviolable, is exposed to official invasion and surveillance.

Though I may deplore the fact that the views of Justices Holmes and Brandeis in the *Olmstead* case did not prevail in the constitutional convention of 1938, I am bound in duty by the quoted provision of the State Constitution (art. I, § 12) as the expression of the will of the People of the State that wire tapping should not be outlawed, however unsavory in character. But when the People declared that " The right of the people to be secure against unreasonable interception of telephone and telegraph communications shall not be violated " they did not speak only hollow words. The recognition of privacy only dimly presaged in older systems of law is part of the expanding concept of the individual's right to be free from unwarranted intrusion (Civil Rights Law, §§ 50, 51). The right of privacy is the right " to be let alone " — the right of " inviolate personality." A tapped wire is the greatest invasion of privacy possible. However rationalized, its authorized use has its roots in the amoral doctrine that the end justifies the means. Hence, the most drastic safeguards cannot be too stringent.

The safeguards prescribed in the Constitution itself reveal a clear recognition of the danger which lurks in too ready a use of the power to tap wires. The exercise of the power given by law to authorize a telephone interception is within the broad discretion of the judge to whom application for an order is

made. And the real — not nominal — exercise of a true — not formal — discretion is a supremely important procedural safeguard. As Dean Griswold of the Harvard Law School put it: '' Liberty is preserved by the maintenance of proper procedures. It is through procedural rules that the individual is protected against arbitrary governmental action. The complaint against the Star Chamber was chiefly one of bad procedures. Methods and procedures are of the essence of due process. Mr. Justice BRANDEIS wrote some thirty years ago, ' in the development of our liberty insistence on procedural regularities has been a large factor.' Burdeau v. McDowell, 256 U. S. 465, 477 (1921). More recently Mr. Justice FRANKFURTER has put the same truth in these words: ' The history of liberty largely has been the history of observance of procedural safeguards.' McNabb v. United States, 318 U. S. 332, 347 (1943).''

The need for the suppression of the crime of gambling is not a consideration exclusive of all other social imperatives. We no longer tolerate the rack and the thumbscrew and like instruments.

The primacy of the community's right to protect itself certainly '' is a postulate inherent in the life '' of social order. But we must be zealous to appraise justly the relative spheres of individual right and public interest and maintain an exacting though delicate balance between them. The balance may become precarious at times; and when the sacrifice of privacy does not produce a commensurate advantage to the community the price is too high — to adapt the words of England's new Lord Chancellor. '' Weapons designed for the protection of law become the instruments of tyranny '' he said recently, echoing Coke's classicism that '' every oppression by authority is a kind of destruction * * *; and it is the worst oppression that is done by the colour of justice.''

The telephone is in such general use that it is truly a part of our everyday life. It is a ready vehicle of communication for people of every station and everything of mutual human concern, whatever its nature, passes over its wires. Interference with its privacy is a direct assault on liberty, and the maintenance of an interception differs in no substantial sense from stationing a police officer at the elbow of the person using the telephone to record what he says.

A telephone interception is a far more devastating measure than any search warrant. A search warrant is confined to a

definite place and to specific items or, at least, to items of a stated class or description. Those in possession of the searched premises know the search is going on and, when the officer has completed his search, whether successfully or not, he departs. Not so, in the case of a telephone interception. The interception order is obtained ex parte and the person whose line is to be tapped is, of course, in ignorance of the fact. The tap is maintained continuously, day and night. Everything said over the line is heard, however foreign to the stated objective of the law-enforcement officers. The most intimate conversations, personal, social, professional, business or even confidential of an unlimited number of persons may be laid bare. In effect, the line of everyone who is called from or makes a call to the tapped line at any time is being tapped during the maintenance of the tap. When a line in a public telephone booth is tapped, as has on occasion been done, the conversations of people having no relation of any kind to the operator of the place in which the booth is situated or the person whose line is tapped, are overheard. It is little wonder that Justice Brandeis was moved to say in the *Olmstead* case: "As a means of espionage, writs of assistance and general warrants are but puny instruments of tyranny and oppression when compared with wire-tapping." (277 U. S. 438, 476.)

It cannot even be said in partial extenuation of this revolting practice, that it yields worth-while results. The reports submitted to me in the past refute any such claim. As evil as an actual interception is the fear bred in the mind of the average citizen that he may at any time become the victim of one. "The freedom of private communication in our society is a value which will not permit wire tapping except when other vitally important social values require it." (Westin, Wire-Tapping Problem, 52 Col. L. Rev. 165, 201.) In his thoughtful study "Freedom, Loyalty, Dissent" Professor Henry Steele Commager observes that "if in the name of security or loyalty we start hacking away at our freedom * * * we will in the end forfeit security as well."

No fact appears here sufficiently compelling to justify the order sought. Indeed, beyond the formal matters prescribed by the statute, the papers disclose little beyond the desire of the applicants for the requested order. It is unnecessary to lay down any absolutes. The court need go no further than determine the pending applications for, as Judge Cardozo said in *Matter of State Ind. Comm.* (224 N. Y. 13, 18): "We deal with the particular instance; and we wait till it arises."

The constitutional right to be free from unreasonable interception of telephone communications is fundamental to ordered liberty. The right should be stoutly preserved, not frittered away. This is not a proper instance for the exercise of the drastic power lodged in the court. The sacrifice is disproportionate to the possible gain.

What I know as a citizen I would not ignore as a Judge. Our city has been the symbol of the nation, the seat of its culture and of our commerce — the center of its influence. It is melancholy to behold her rife with violence, an admittedly lawless community: its inhabitants no longer safe by night or day, in their persons or their homes. To be redeemed as part of the great American community, its police department needs external aid, i.e., a larger force with more pay for the men, and a renewed spirit from within — which its valiant commissioner seems to be generating; but not more wire taps! Application denied.