277 F.2d 739
 Burton N. PUGACH, Petitioner-Appellant,
v.
Honorable Isidore DOLLINGER, District Attorney of Bronx
County, and Honorable Stephen P. Kennedy, Police
Commissioner of the City of New York,
Respondents-Appellees.
John O'ROURKE, Joseph De Grandis, Frank De Forte, Ernest
Zundel, Herbert Jacob, Eugene Jacob, Lawrence Gallo, Joseph
Gallo, Norman J. Clark, Jr., Charles De Forte, Anthony
Pafumi, also known as Angelo Pafumi, Kenneth Ciazza,
Pasquale Catroppa, Phillip Losquadro and Vincent Losquadro,
Plaintiffs-Appellants,
v.
Manuel W. LEVINE, individually, and as District Attorney of
Nassau County, State of New York, and John M. Beckmann,
individually, and as Commissioner of Police of Nassau
County, State of New York, Defendants-Appellees.
 Nos. 306, 307, Dockets 26116, 26147.
 United States Court of Appeals Second Circuit.
 Argued March 8, 1960.
Decided April 14, 1960.
 
 Herbert S. Siegal and Louis Fusco, Jr., New York City, for appellant Burton N. Pugach.
 Arthur Karger, New York City (Zoloto & Karger, Jacques M. Schiffer, New York City, Price & Iovine and Leo Healy, Brooklyn, N.Y., on the brief), for appellants John O'Rourke et al.
 Emanuel Redfield, New York City, for the New York Civil Liberties Union, amicus curiae.
 Irving Anolik, Asst. Dist. Atty., New York City (Isidore Dollinger, Dist. Atty., and Walter E. Dillon, Asst. Dist. Atty., New York City, on the breif), for appellees Isidore Dollinger and Stephen P. Kennedy.
 Henry P. Devine, Asst. Dist. Atty., Nassau County (Manuel W. Levine, Dist. Atty., Port Washington, N.Y., on the brief), for appellees Manuel W. Levine and John M. Beckmann.
 Louis J. Lefkowitz, Atty. Gen., State of New York, Samuel A. Hirshowitz, First Asst. Atty. Gen., George K. Bernstein, Asst. Atty. Gen. and Vincent A. Marsicano, Asst. Atty. Gen., amicus curiae.
 Before LUMBARD, Chief Judge, and CLARK, WATERMAN, MOORE and FRIENDLY, Circuit Judges.
 LUMBARD, Chief Judge.
 The question for decision is whether a federal court should enjoin state officers from divulging wiretap evidence in a state criminal trial, when introduction of this evidence will constitute the violation of a federal criminal statute. In the two cases before us Judges Bryan and Rayfiel both refused to grant injunctive relief, and we affirm their judgments.
 In No. 306, Pugach v. Dollinger, appellant and several others were indicted in November 1959 by the State of New York for burglary in the second degree, maiming, assault in the second degree and conspiracy. Their case was set for trial on January 7, 1960. About two weeks before the trial was to begin appellant brought this suit in the Southern District of New York to enjoin the Bronx County District Attorney, the New York City Police Commissioner and their agents from making use at the state trial of evidence obtained by tapping appellant's telephone wires in June 1959 and of evidence obtained by the use of information overheard in the course of the tapping. The complaint alleged that, although the wiretap was obtained pursuant to state court authorization and in accordance with a state statute, its divulgence would constitute a violation of 605 of the Communications Act of 1934, 47 U.S.C.A. 605. It further stated that wiretap evidence had been introduced before the grand jury in obtaining appellant's indictment and that the district attorney intended to make use of such evidence at trial. The district attorney has not denied that he expects to use wiretap evidence, nor does he contest appellant's allegations that appellant will be subject to irreparable injury if convicted by means of such evidence. Judge Bryan, relying primarily upon Stefanelli v. Minard, 1951, 342 U.S. 117, 72 S.Ct. 118, 96 L.Ed. 138, declined to grant a preliminary injunction and dismissed the complaint. Pugach v. Sullivan, D.C.S.D.N.Y.1960, 180 F.Supp. 66. Upon motion by appellant, this court stayed introduction of the wiretap evidence, pending determination of the appeal.[1]
 In No. 307, O'Rourke v. Levine, appellants are presently on trial in the Nassau County Court on an indictment charging them with conspiracy, extortion, attempted extortion and coercion. The selection on jurors began on February 1, 1960 and the taking of testimony started a week later. Suit in the Eastern District of New York to enjoin the introduction of wiretap evidence was commenced on February 16, 1960. The allegations of the appellants' bill are substantially the same as those in the Pugach case, though in O'Rourke the district attorney had stated on the record in the state court trial his intention to make use of wiretap evidence. Judge Rayfiel denied a preliminary injunction, distinguishing the grant of the stay pending appeal in Pugach on the ground that much greater disruption of the state court proceeding would result were the introduction of evidence in a trial already in progress enjoined. Both this court and subsequently Mr. Justice Harlan of the Supreme Court, 80 S.Ct. 623, declined to stay the introduction of the wiretap evidence pending appeal.
 
 
 1
 We convened an en banc session of the court to hear these appeals.
 
 
 2
 The jurisdiction of the district courts was properly founded upon 1337 of the Judicial Code, 28 U.S.C., which states that 'the district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce * * *' The Communications Act of 1934 is an 'Act of Congress regulating commerce.' See Benanti v. United States, 1957, 355 U.S. 96, 104-105, 78 S.Ct. 155, 2 L.Ed.2d 126; cf. Mulford v. Smith, 1939, 307 U.S. 38, 46, 59 S.Ct. 648, 83 L.Ed. 1092. Since the asserted right to relief is based upon 605 of the Communications Act, a suit to protect the federal right against impairment by state officers is a suit 'arising under' the federal statute. American Federation of Labor v. Watson, 1946, 327 U.S. 582, 590-591, 66 S.Ct. 761, 90 L.Ed. 873.[2]
 
 
 3
 Section 605 of the Communication Act states in pertinent part: '* * * no person not being authorized by the sender shall intercept any communication and divulge the existence, contents, substance, purport, effect or meaning of such intercepted communication to any person * * *' In Nardone v. United States, 1937, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 and 1939, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307, the Supreme Court held that under 605 evidence obtained from wiretapping by federal officers was inadmissible in a federal court. In Schwartz v. State of Texas, 1952, 344 U.S. 199, 73 S.Ct. 232, 97 L.Ed. 231, upon direct review of a state criminal conviction it was held that the use of the same kind of evidence obtained by state officers was not prohibited by 605. The Court stated that it would not presume, in the absence of any clear manifestation of intent, that Congress intended to supersede a state rule of evidence permitting the introduction of evidence obtained by state officers and divulged in violation of a federal statute. Two years ago, in Benanti v. United States, supra, the Court held that wiretap evidence obtained by state officers was not admissible in a federal court, although the evidence was procured in accordance with a New York state statute authorizing wiretapping pursuant to court order.[3] The Court reasoned that under 605 Congress intended to exclude from use in the federal courts evidence the divulgence of which would be unlawful, regardless of its source. Though the Court made clear that taping coupled with divulgence was a violation of 605, even when done pursuant to state law, it carefully distinguished the decision in Schwartz v. State of Texas, supra.[4]
 
 
 4
 Appellants contend that we should enjoin the defendants from introducing wiretap evidence in the state court trials, since the divulgence of this evidence will violate 605. They contend that if we do not intervene, they will be subject to irreparable injury, because, if the evidence is introduced and they are found guilty their convictions will not be subject to reversal on appeal either under New York law, see People v. Variano, 1959, 5 N.Y.2d 391, 185 N.Y.S.2d 1, 157 N.E.2d 857, or federal law, Schwartz v. State of Texas, supra.
 
 
 5
 The exercise of the power of a federal court to grant equitable relief is a matter of discretion. In each case the court must balance the factors for and against the use of its power. See Douglas v. City of Jeannette, 1943,319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324. Here we think that the district courts properly concluded that the balance weighs against the exercise of the power to grant injunctive relief. We agree that in the circumstances of these two cases a federal court should not intervene in criminal prosecution by a state for violation of its criminal laws. See Voci v. Storb, 3 Cir., 1956,235 F.2d 48.
 
 
 6
 Both Congress and the Supreme Court have often indicated their concern for the preservation of the balance between the states' administration of their laws and the use of federal equity power by restriction or withholding of the power of the federal courts. See, e.g., 28 U.S.C. 1342, 2283; Stefanelli v. Minard, supra; Watson v. Buck, 1941, 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 1416; State of Maryland v. Soper, 270 U.S. 9, 46 S.Ct. 185, 70 L.Ed. 449; Id., 270 U.S. 36, 46 S.Ct. 192, 70 L.Ed. 459, and 1926, 270 U.S. 44, 46 S.Ct. 194, 70 L.Ed. 462. Moreover, Congress, in 501 of the Communications Act, 47 U.S.C.A. 501, has provided that violation of 605 shall be a misdemeanor,[5] and we have held that 605 creates a civil action for damages in favor of one whose line is tapped. Reitmeister v. Reitmeister, 2 Cir., 1947, 162 F.2d 691. Finally, we cannot overlook the long recognized principle of equity, based upon the policy of preserving the right to jury trial, that a court should not enjoin the commission of a crime. With these factors in mind, we do not think that a federal court should interfere with the prosecution of a state criminal proceeding in order to provide an additional means of vindicating any private rights created by 605.
 
 
 7
 We are guided in our determination by the decision of the Supreme Court in Stefanelli v. Minard, supra. There the Court held that a federal court should refuse to intervene in a state criminal proceeding to enjoin the use of evidence claimed to have been secured by an unlawful search and seizure contrary to the Fourth Amendment. The plaintiff's claim in Stefanelli was closely alalogous to that made here-- that since under Wolf v. People of State of Colorado, 1949, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782, admission in a state court of evidence obtained by an unlawful search and seizure would not be ground for reversal of the conviction, a federal court should enjoin the introduction of such evidence. Mr. Justice Frankfurter's statement of the reasons for refusing injunctive relief in Stefanelli are equally applicable here:
 
 
 8
 'The consequences of exercising the equitable power here invoked are not the concern of a merely doctrinaire alertness to protect the proper sphere of the States in enforcing their criminal law. If we were to sanction this intervention, we would expose every State criminal prosecution to insupportable disruption. Every question of procedural due process of law-- with its far-flung and undefined range-- would invite a flanking movement against the system of State courts by resort to the federal forum, with review of need be to this Court to determine the issue. Asserted unconstitutionality in the impaneling and selection of the grand and petit in the failure to appoint counsel, in the admission of a confession, in the creation of an unfair trial atmosphere, in the misconduct of the trial court-- all would provide ready opportunities, which conscientious counsel might be found to employ, to subvert the orderly, effective prosecution of local crime in local courts. To suggest these difficulties is to recognize their solution.' 342 U.S. at pages 123-124, 72 S.Ct. at page 121.
 
 
 9
 It is urged that Stefanelli differs from the cases before us in that there the violation of federal law was the unlawful search itself, which has already taken place at the time of the suit for injunctive relief and which the federal court could therefore not prevent, while here the very act of divulging the evidence will constitute the commission of a federal crime. The distinction is not persuasive. The decision in Stefanelli was placed on no such narrow ground, but was the expression of a general policy against 'piecemeal' intervention by the federal courts in state proceedings for the purpose of litigating collateral issues. Moreover, the fact that the divulgence of the evidence sought to be enjoined will constitute the commission of a crime is not significant, since the plaintiffs must prevail, if at all, by vindication of their own rights under 605, not by collateral enforcement of the rights of the United States to prosecute under 501. As the Supreme Court said in Schwartz v. State of Texas, supra, 344 U.S. at page 201, 73 S.Ct. at page 234, 'the introduction of the intercepted communications would itself be a violation of the statute' is 'simply an additional factor for a state to consider in formulating a rule of evidence for use in its own courts. Enforcement of the statutory prohibition in 605 can be achieved under the penal provision of 501.'
 
 
 10
 Neither do we find it a persuasive ground of distinction that Stefanelli was an isolated case of federal law violation in New Jersey rather than what is called a consistent pattern in New York. Indeed, it could be argued that the constant conflicts that would be engendered between federal and state courts in an effort to deal with such a pattern would make this an a fortiori case for refusal to interfere. We have no reason to think that issuance of injunctions in these two cases would lead New York prosecutors to desist from this time forward from offering wiretap evidence in New York courts as permitted by the law of that state. On the contrary, the district courts would be flooded with suits for injunctions against the use of wiretap evidence and its alleged fruits in the state courts, with the consequent necessity of determining just what evidence was proposed to be introduced and whether the trial had reached such a stage that vindication of the federal right should be subordinated to practical considerations of state law enforcement; and all these determinations would be subject to appeal, with the prosecution obstructed in the meanwhile. Our respect for the supremacy clause is deep and abiding. But, as recognized in Stefanelli v. Minard, direct interference by federal courts in state criminal trials is quite a different matter from the analogies suggested by our brother Clark.
 
 
 11
 The stay granted by this court in Pugach v. Dollinger is vacated. The judgments are affirmed.
 
 
 12
 WATERMAN, Circuit Judge (concurring).
 
 
 13
 I concur in the result reached in both cases by the majority of the court; but I believe I should separately state certain individual views.
 
 
 14
 The injunction sought by petitioners in O'Rourke et al. v. Levine must be denied. A jury had been impaneled, trial had already begun, and some testimony already been adduced, when the district court was importuned to affect future trial developments by an injunction order which, if granted, might limit the People's further froof. The disruptive complications that ensue when federal judicial power is exercised to interfere with a state court criminal trial after testimony has been received there clearly dictate that we affirm the action below. A proper respect for the relation of the United States to the States and the Courts of the States under these circumstances permits, in my belief, no other result. If at trial it appears that Section 605 of the Federal Communications Act is violated by an unauthorized divulgence by a witness under oath of an intercepted communication the United States can enforce that violation against the witness by prosecuting him under 501 of that Act. In fact, as I read the opinion of the Chief Justice speaking for a unanimous court in Benanti v. United States, 355 U.S. 96, at pages 103-106, 78 S.Ct. 155, 2 L.Ed.2d 126, even though the interception was authorized by a New York state wiretap order, the divulgence would be such a clear violation of the Federal Communications Act that federal prosecuting officers would be expected to so prosecute.
 
 
 15
 Though I also concur in the result the majority reaches in Pugach v. Dollinger and Kennedy, the problems presented to us in that situtation are much more difficult to resolve. There trial is not under cult to resolve. There trial is not under way, and an injunction issued by us in the exercise of our equiry powers to preserve compliance with 'the Supreme Law of the Land; * * * any Thing in the Constitution or Laws of any State to the Contrary notwithstanding,' will not disrupt a trial or create any confusion. Forbidding the introduction of wiretap testimony at a trial not yet begun would only serve to prevent counsel from introducing certain material; it would neither stay the criminal prosecution itself, nor embarrass the progress of a trial, nor require a mid-trial shift of strategy. And though New York, as well as the two other states in our Circuit, does not inquire how offered evidence was obtained, the quashing of wiretap evidence in advance of trial would not appear to be an unwarranted intrusion by us into State affairs inasmuch as the federal government has a very special interest in this field, an interest set forth by Congress in the Federal Communications Act with such thoroughness as to preempt the states from regulation savefor certain stated exceptions not here applicable. Benanti v. United States, 1957, 355 U.S. 96, 103-106, 78 S.Ct. 155, 2 L.Ed. 126.
 
 
 16
 I receive the impression from reading the majority opinion that the majority, although having a deep and abiding respect for the supremacy clause, do not think that a federal court should ever interfere with the prosecution of a state criminal proceeding.
 
 
 17
 To such doctrine I cannot subscribe.
 
 
 18
 In order to preserve as best can be the pluralism of our form of government it is true that in the exercise of a proper judicial self-restraint we should ever hesitate to interfere with state criminal proceedings-- even as here, where it is claimed that unless we do interfere there will be open and overt violations of an Act of Congress.
 
 
 19
 But it is also true that though, as a general policy, we should refuse to act, there are 'exceptional cases which call for the interposition of a court of equity to prevent irreparable injury which is clear and imminent * * *' Chief Justice Stone speaking for the Court in Douglas v. City of Jeannette, 319 U.S. 157, at page 163, 63 S.Ct. 877, at page 881, 87 L.Ed. 1324.
 
 
 20
 Pugach v. Dollinger is an exceptional case, and it may well be that Judge Clark and Judge Medina are soundest in their approach to the problems it poses. I have hesitated to agree with them only because I have faith that there is no clear irreparable injury to Pugach at this time. I assume, arguendo, that divulgence of information obtained by wiretap at his Bronx County trial will do Pugach irreparable injury; but I am not willing also to assume that a New York state trial judge will permit such evidence to be admitted over the objection of defense counsel. After all, New York state judges, as we, were bound when they took office, to support the Constitution of the United States; and they are fully cognizant of Article VI, Clause 2 thereof:
 
 
 21
 '2. This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'
 
 
 22
 Schwartz v. State of Texas, 1952, 344 U.S. 199, 73 S.Ct. 232, 97 L.Ed. 231, and Benanti v. United States, supra, make clear, and all the opinions of the court in the present case recognize, that divulgence of the contents of a wiretap unless the divulgence is authorized by the sender will constitute a violation of Sections 605 and 501. It is therefore presumptuous to assume that any New York State trial judge will acquiesce to the commission of a crime against the United States in his presence in his courtroom by a witness testifying under oath.
 
 
 23
 Though I hope I have made myself clear that I expect that no evidence of intercepted communications will be admitted at trial anc that it is principally because of this belief that I concur in the result reached by the majority, nevertheless if I believed otherwise I might still refuse to issue an injunction under the doctrine of Douglas v. City of Jeannette, supra. If the offered evidence is admitted, despite Benanti, supra, and if Pugach is convicted and his conviction is affirmed by the New York Court of Appeals-- see People v. Dinan, 1959, 6 N.Y.2d 715, 185 N.Y.S.2d 806, 158 N.E.2d 501, certiorari denied, 361 U.S. 839, 80 S.Ct. 71, 4 L.Ed.2d 78; People v. Variano, 1959, 5 N.Y.2d 391, 185 N.Y.S.2d 1, 157 N.E.2d 857-- even then that conviction is subject to review by the Supreme Court. This possibility of a final federal review of a federal question is perhaps enough so that under Douglas v. City of Jeannette, supra, Pugach may have an adequate remedy at law; and an injunction ought not to issue.
 
 
 24
 Where a state persistently sanctions violation of federal law, due process considerations may arise, see Judge Medina's concurring opinion in United States ex rel. Graziano v. McMann, 2 Cir., 1960, 275 F.2d 284. As I indicated in may majority opinion in Graziano, I am unpersuaded for I believe Schwartz v. State of Texas to be contrilling. But my opinion in that case is hardly the final one, and since Judge Medina's position is well-reasoned, it affords plaintiff something more than a faint prospect that his expected state conviction will be reviewable by the Supreme Court on certiorari. The precise question has never been decided, and in light of the dicta in Salsburg v. State of Maryland, 1954, 346 U.S. 545, 74 S.Ct. 280, 98 L.Ed. 281, and Wolf v. People of State of Colorado, 1948, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782, the possibility of direct review is strong enough to justify my concurrence in the result reached by the majority. Nor should we overlook the possibility that the Supreme Court might grant certiorari to reconsider Schwartz v. State of Texas.
 
 
 25
 Furthermore, I should point out that I not only differ from the majority wherein they apparently suggest that a federal court should never interfere with a state criminal prosecution, but I also differ from them wherein they rely for their result upon the doctrine expressed in Stefanelli v. Minard, 1951, 342 U.S. 117, 72 S.Ct. 118, 96 L.Ed. 138. Without in the least detracting from the force of that opinion it is may belief that that case and its doctrine are alike inapplicable here. In Stefanelli whatever federal crime was present had been fully committed before the federal court was importuned to interfere with the State court proceedings. Here the threatened commission of federal crime is sought to be prevented by an application for relief to a federal court in advance of the occurrence. In the unlikely event a person were officially advised that his home was to be illegally searched by state officers on a particular date, I would suppose he could readily obtain injunctive relief from a federal court. It would be in this posture of affairs that the two situations would be similar.
 
 
 26
 One final point needs to be made. Normally it is not the province of a member of the federal judiciary to suggest to a United States District Attorney how he should perform his duties. I point out that in oral argument before this court sitting in banc counsel for the Pugach respondent-appellees did not deny that it was planned to offer wiretap evidence at that trial, and thereby did not deny to five federal judges in open court an intent to commit a federal crime. If such a crime is committed and remains unprosecuted after it has been stated by the U.S. Supreme Court in Schwartz v. State of Texas, supra, 344 U.S. at page 201, 73 S.Ct. at page 234, and by us here that the interests of the United States may be adequately protected through enforcement of the penal provisions of Section 501, there will have been a most extraordinary affront to this court. Accordingly I ask that the United States District Attorney for the Southern District of New York follow the proceedings in People v. Pugach with the closest attention. Similarly, I invite the attention of the United States District Attorney for the Eastern District of New York to the proceedings in People v. O,'Rourke, etc.
 
 
 27
 CLARK, Circuit Judge (dissenting).
 
 
 28
 In its latest pronouncement upon the issue, the Supreme Court of the United States has refused to find exception for state officers from the sweeping federal ban on unauthorized interception and divulgence of 'any communication,' contained in 605 of the Federal Communications Act, 47 U.S.C. 605. Speaking through the Chief Justice of the United States, a unanimous Court finds 'that Congress, setting out a prohibition in plain terms, did not mean to allow state legislation which would contradict that section and that policy.' And it points out the failure of Congess to grant exceptions, though strongly importuned to do so. Benanti v. United States, 355 U.S. 96, 105, 106, 78 S.Ct. 155, 160, 2 L.Ed.2d 126.
 
 
 29
 Notwithstanding its decisive character, there is nothing surprising in the Court's statement; indeed, it would have been surprising had the Court said less. For the absolute character of the prohibition has been steadily emphasized over the years and the attempt to make the statute say less than it does has been conspicuously unsuccessful. So we must accept the interpretation that wire tapping, whether by state officers or by anyone else, is simply and shortly forbidden by federal law, subject to severe penalties of fine and imprisonment. 47 U.S.C. 501. Attack must therefore by limited to the need of new legislation because of its hampering effects on law enforcement if prosecuting officials cannot have the benefit of at least 'controlled' wire tapping. Involved are surely weighty arguments of public policy which the legislative body should weigh.[1] But these arguments have not as yet prevailed with the only governmental agency having authority to act to modify the existing law, and I do not see how they can affect the responsibility of United States judges to enforce that law. Hence for us I see no escape but to start with the premise that we are faced with repeated open and acknowledged violations of federal law which we are assured will be continued until and unless federal authorities intervene.
 
 
 30
 Thus we have an absolute impasse going so far as to be almost ludicrous if the issue were not so foundamentally serious. It seems generally conceded that wire tapping is an evil thing, particularly when employed by criminal or underworld characters and their associates. Yet it has not been possible to enforce the law against such persons when at the same time it is not enforced against even more open violators, albeit with loftier motives.[2] Thus one restrained comment puts it mildly: 'Weighing the individual's right to privacy against the need for effective detection of criminals, we are met with the kind of conflict of values which characterizes many areas of our law and our social organization. In the case of wire tapping, however, this competition of social interests has resulted in a dangerous stalemate-- a failure to find a workable adjustment-- which leaves Mr. Smith, the average citizen, at the mercy of the more ruthless in our population. For, despite the statutes and judicial decisions which purport to regulate wire tapping, today this practice flourishes as a wide-open operation at the federal, state, municipal, and private levels.' Westin, The Wire-Tapping Problem: An Analysis and a Legislative Proposal, 52 Col.L.Rev. 165, 167 (1952).
 
 
 31
 Professor Westin goes on to point out (from a careful analysis of congressional hearings and other cited material) how this 'stalemate' affects the lives and fortunes of ordinary citizens, as well as others, and how the criticized practice taps the conversation of public officials in every sort of government agency, of business men in business organizations, of private persons for purposes as diverse as labor espionage of securing evidence of a wife's infidelity, and with schools or training centers for instructing telephone tappers.[3] More recently a detailed study sponsored by the Pennsylvania Bar Association Endowment shows much of wire tapping in action, with a description of 'The Tools' and with detailed investigation particularly of police activities in several important metropolitan areas, including New York. See Dash, Schwartz, and Knowlton, The Eavesdroppers 35 et seq. (1959). This suggests a much more prevalent practice than many officials have been willing to admit, although even the conceded number of ex parte court orders issued under the New York statutes appears quite adequate to show the pattern.[4] And other material of like effect is extensively available.[5]
 
 
 32
 In sum it is beyond dispute that there is a general, indeed universal, custom of federal law violation. Now this is a distressing situation, made not less so that in the eyes of many worthy citizens it is required by the asserted exigencies of successful law administration. But it is not an unusual situation. For actually it is a clash between federal and state governmental policies. As such it is a recurring struggle in our history and quite possibly a necessary one to a federal form of government.[6] In the past we have found ways of meeting and solving the problem. Of course there are several forms of remedy; but the one to which there seems continual return when other remedies fail is the resort to the equity powers of the federal courts to enjoin repeated violations of the criminal law. This is an old and well established ground of equity jurisdiction, naturally to be resorted to only reluctantly as against state officials, but nevertheless thoroughly recognized. Thus the authority of United States courts to enjoin state officials, including prosecutors and others, from repeated violations of overriding federal law has long been upheld in a variety of circumstances such as alien land ownership, rate regulation, closed shop and railroad tariff laws, and the like. Thus, for example, see American Federation of Labor v. Watson, 327 U.S. 582, 66 S.Ct. 761, 90 L.Ed. 873; West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674; Watson v. Buck, 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 1416; Hague v. C.I.O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423; Sterling v. Constantin, 287 U.S. 378, 53 S.Ct. 190, 77 L.Ed. 375; Terrace v. Thompson, 263 U.S. 197, 44 S.Ct. 15, 68 L.Ed. 255; Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714; Smyth v. Ames, 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819, modified 171 U.S. 361, 18 S.Ct. 888, 43 L.Ed. 197. And see also Rea v. United States, 350 U.S. 214, 76 S.Ct. 292, 100 L.Ed. 233, upholding an injunction preventing a federal agent from transferring federally suppressed evidence to a state court or there testifying.
 
 
 33
 Directly in point also and perhaps most persuasive of all in view of the close analogy are the modern segregation cases. Thus see Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, 38 A.L.R.2d 1180, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083; Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5; Harrison v. National Ass'n for the Advancement of Colored People, 360 U.S. 167, 179, 79 S.Ct. 1025, 3 L.Ed.2d 1152; Faubus v. United States, 8 Cir., 254 F.2d 797, certiorari denied 358 U.S. 829, 79 S.Ct. 49, 3 L.Ed.2d 68; Clemons v. Board of Ed. of Hillsboro, Ohio, 6 Cir., 228 F.2d 853, certiorari denied Board of Ed. of Hillsboro, Ohio v. Clemons, 350 U.S. 1006, 76 S.Ct. 651, 100 L.Ed. 868. As these cases all demonstrate, a suit against a state officer violating federal law is not within the prohibition of actions against a state. See also Judge Parker's complete statement in School Bd. of City of Charlottesville, Va. v. Allen, 4 Cir., 240 F.2d 59, certiorari denied 353 U.S. 910, 77 S.Ct. 667, 1 L.Ed.2d 664.
 
 
 34
 All these questions of jurisdiction the majority opinion herewith concedes, including the irreparable injury sustained. I agree thoroughly with the principles here stated; but that leaves only Stefanelli v. Minard, 342 U.S. 117, 72 S.Ct. 118, 96 L.Ed. 138, and the question of the niceties of the exercise of federal equity jurisdiction left to give us pause. For Stefanelli recognizes the jurisdiction of equity and emphasizes only the restraint which the federal court should show against interfering with state criminal processes. I agree wholeheartedly, but ask (as was asked with respect to Little Rock schools, martial law in the Texas oil fields, and other historic federal-state clashes), When does enough of federal law violation become too much? The facts rehearsed above demonstrate in my opinion that only by the course of federal injunction will the present impasse be resolved. Schwartz v. State of Texas, 344 U.S. 199, 73 S.Ct. 232, 97 L.Ed. 231, shows that the way is not by appeal from a conviction already had; indeed it confirms the view that this is the one healthy and direct and complete solution. A clean excision is better than continuous mangling. Involved in Stefanelli was an isolated case of federal law violation, not a consistent pattern as here. Also to be noted is the less direct compulsion of the federal law there, since the Fourth Amendment does not touch the problem of communication and evidence directly; no federal crime was there involved; and the damage had already been done.[7] Carefully considered I regard Stefanelli as authority showing the need and the utility of the action I urge, rather than to the contrary.
 
 
 35
 Consequently I am persuaded by and would follow the good opinion of Judge Medina upon the grant of a stay in this case. Pugach v. Dollinger, 2 Cir., 275 F.2d 503. I also note that two state justices have reached a like conclusion and decline to proceed further in wire tapping. Matter of Interception of Telephone Communications, 9 Misc.2d 121, 170 N.Y.S.2d 84, Hofstadter, J.; Application for an Order Permitting the Interception of Telephone Communications of Anonymous, 207 Misc. 69, 136 N.Y.S.2d 612, Hofstadter, J.; Application for Order Permitting Interception of Telephone Communications, N.Y.Ct.Gen. Sess., 198 N.Y.S.2d 572, Davidson, J.[8] These cases not only illustrate the uncertain and anomalous position into which state judges are now thrust, but also are good examples to United States judges. In the first case cited here, Mr. Justice Hofstadter makes a very pointed allusion to the mandate of the United States Constitution that laws made pursuant to it are 'the supreme Law of the Land,' binding upon us all, 'any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.' U.S.Const. Act. VI, cl. 2. This reminder from a distinguished state brother of the necessity for obedience to the 'Supreme Law' ought to go far to allay the fear expressed that the state officials will defy this law, even after it has been authoritatively defined in the course of this litigation, and that the federal courts will be flooded with actions to curb this defiance. For my part I entertain no such fear of either the defiance or the flood of cases; and hence I forego comment on the implication that mere number of applications may bar the right to equity relief. On the contrary I venture to believe that our state brothers and colleagues in law enforcement, both on the bench and in the prosecuting offices, will welcome definitive resolution of the present hopeless stalemate and will hasten to comply with the requirements of law as soon as they are made clear.
 
 
 36
 I would reverse the judgments below for the issuance of the injunctions sought.
 
 
 
 [1]
 2 Cir., 1960, 275 F.2d 503. There were three opinions. Judge Medina voted to grant the stay on grounds that would lead equally to the grant of an injunction. Judge Waterman concurred in the grant solely to preserve the status quo lest the case become moot before the appeal could be decided. Judge Madden of the Court of Claims, sitting with the Court by designation, dissented
 
 
 [2]
 Whether jurisdiction may also lie under 28 U.S.C. 1343(3) we do not decide
 Section 1343 provides in part: 'The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
 '(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States * * *'
 In McGuire v. Amrein, D.C.D.Md.1951, 101 F.Supp. 414, the court held that it did not have jurisdiction of a suit identical in nature to that here under 1343(3), since 605 is not an 'Act of Congress providing for equal rights of citizens' as that phrase is used in 1343(3). In Stefanelli v. Minard, 1951, 342 U.S. 117, 72 S.Ct. 118, 96 L.Ed. 138, the Supreme Court reserved the question whether jurisdiction lay under 1343(3) in a suit to enjoin the introduction of evidence in a state trial on the ground that the evidence was obtained by means of an unlawful search and seizure.
 
 
 [3]
 Section 813-a of the New York Code of Criminal Procedure, under which the wiretap orders were issued in Benanti and in the cases before us states in part:
 'An ex parte order for the interception, overhearing or recording of telegraphic or telephonic communications may be issued by any justice of the supreme court or judge of a county court or of the court of general sessions of the county of New York upon oath or affirmation of a district attorney, or of the attorney-general or of an officer above the rank of sergeant of any police department of the state or of any political subdivision thereof, that there is reasonable ground to believe that evidence of crime may be thus obtained and identifying the particular telephone number of telegraph line, and particularly describing the person or persons whose communications are to be intercepted, overheard or recorded and the purpose thereof. * * * Any such order shall be effective for the time specified therein but not for a period of more than two months unless extended or renewed by the justice or judge who signed and issued the original order upon satisfying himself that such extension or renewal is in the public interest. * * *'
 Section 813-a was originally enacted in 1942 pursuant to Art. 1, 12, para. 2 of the New York Constitution, adopted in 1938, which states:
 'The right of the people to be secure against unreasonable interception of telephone and telegraph communications shall not be violated, and ex parte orders or warrants shall issue only upon oath or affirmation that there is reasonable ground to believe that evidence of crime may be thus obtained, and identifying the particular means of communication, and particularly describing the person or persons whose communications are to be intercepted and the purpose thereof.'
 
 
 [4]
 Whether both a tapping and a divulgence are necessary for a violation of 605 was specifically reserved by the Supreme Court in Benanti. See 355 U.S. at page 100 note 5, 78 S.Ct. at page 157. Since both elements are involved here, we need not consider whether tapping alone is lawful
 
 
 [5]
 Convictions have been upheld under 501 for violation of 605. E.g., United States v. Gris, 2 Cir., 1957, 247 F.2d 860
 
 
 [1]
 That the legislative is the correct and indeed the only approach to a solution is the tenor of a discriminating article by the Chairman of the New York Joint Legislative Committee to Study Illegal Interception of Communications. Savarese, Eavesdropping and the Law, 46 A.B.A.J. 263 (1960). See also Gerhart, Let's Take the Hypocrisy Out of Wiretapping, 30 N.Y.St.B.Bull. 268 (1958); Williams, Wiretapping Should Be Liberalized, 30 N.Y.St.B.Bull. 261 (1958)
 
 
 [2]
 There appears to have been only one successful prosecution under the statute. United States v. Gris, 2 Cir., 247 F.2d 860. James R. Hoffa was prosecuted and acquitted. See Savarese, supra note 1, at 266
 
 
 [3]
 52 Col.L.Rev. 165, 167, 168 (1952), quoted by Professor Donnelly of Yale in his careful article, Comments and Caveats on the Wire Tapping Controversy, 63 Yale L.J. 799 (1954)
 
 
 [4]
 In Wiretapping in New York, 31 N.Y.U.L.Rev. 197 (1956), the figures for the orders received by the telephone company in New York City are given, viz., 1135 orders (good for 90 days) affecting 1954 wires for the year 1954 and 1013 orders affecting 1662 wires for the year 1953. The defendants take exception to the figures given by Mr. Justice Douglas, An Almanac of Liberty 355 (1954), but quote approvingly those given by Brown and Peer, The Wiretapping Entanglement; How to Strengthen Law Enforcement and Preserve Privacy, 44 Cornell L.Q. 175, 183 (1959), as being a total of 480 orders in New York City in 1952. In Dash, Schwartz and Knowlton, The Eavesdroppers 39 et seq., 68, 69 (1959), the authors suggest that Mr. Justice Douglas' estimate properly refers to wire taps, not orders, and then, making their own estimate of from 16,000 to 29,000 wire taps a year, also suggest that the Justice's estimate is thus 'closer to the truth than the figures submitted by the police to the Kings County prosecutor.' More lately Mr. Dash has given an estimate of from 13,000 to 20,000 wire taps per year. Hearing before the Subcommittee on Constitutional Rights of the Committee on the Judiciary, U.S. Senate, 86th Cong., 1st Sess., pursuant to S. Res. 62, Pt. 3, Wiretapping, Eavesdropping, and the Bill of Rights, 520-521 (1960)
 
 
 [5]
 Earlier citations are given by Professor Donnelly, in the article cited in note 3 supra. Later references appear in 57 Col.L.Rev. 1159 (1957); 26 Ford.L.Rev. 540 (1957); 31 N.Y.U.L.Rev. 197 (1956); 67 Yale L.J. 932 (1958); and Dash, Schwartz and Knowlton, The Eavesdroppers 443, 458 et seq. (1959), including also references to Congressional and New York state legislative hearings. See also the statements and articles by law professors and others in the Hearing cited supra note 4, at 566-714
 
 
 [6]
 See Demet, A Trilogy of Massive Resistance, 46 A.B.A.J. 294, 296 (1960):
 'As demonstrated, disobedience, disrespect and massive resistance to the mandates of the United States Supreme Court are relatively old historical concepts practiced by various of the Sovereign States of the Union when it was felt the Court trespassed into spheres in which the various states had ideological and sociological views contrary to the edicts and mandates of the Court.
 'It is interesting to speculate what the state courts would have done if the segregation cases had reached the Supreme Court by way of state courts and not the federal courts.'
 
 
 [7]
 Hence for the exercise of a court's discretion there is a real difference between a completed case and one which is still pending, as we have held in United States ex rel. Graziano v. McMann, 2 Cir., 275 F.2d 284. This difference might serve to distinguish the O'Rourke case here from that of Pugach. Thus, there is much more reason to refuse an injunction in O'Rourke. On the whole, however-- except and unless the trial has proceeded further than was evident at our hearing-- I do not believe the O'Rourke case has gone so far but that justice will be better served by the issuance of an injunction there also
 
 
 [8]
 So held also by Judge Rayfiel in Burack v. State Liquor Authority of State of N.Y., D.C.E.D.N.Y., 160 F.Supp. 161