**NEW PARK MINING COMPANY,**
Appellant,

v.

**UNITED STEELWORKERS OF AMERI-
CA (AFL-CIO), LOCAL UNION
NO. 4264, Appellee.**

**UNITED STEELWORKERS OF AMERI-
CA (AFL-CIO), LOCAL UNION NO.
4264, Cross-Appellant,**

v.

**NEW PARK MINING COMPANY,**
Cross-Appellee.
Nos. 6556, 6557.

United States Court of Appeals
Tenth Circuit.
March 10, 1961.

Calvin A. Behle, Salt Lake City, Utah (Keith E. Taylor and Parsons, Behle, Evans & Moffat and Willard Y. Morris, Salt Lake City, Utah, of counsel, were with him on the brief), for appellant and cross-appellee.

A. Wally Sandack, Salt Lake City, Utah, for appellee and cross-appellant.

Before HUXMAN, PICKETT and LEWIS, Circuit Judges.

LEWIS, Circuit Judge.

This case reaches us for the second time. In our earlier consideration, 273 F.2d 352, we were concerned with the jurisdictional aspects of claims made by the United Steelworkers of America (AFL-CIO), Local Union No. 4264, (union) against the New Park Mining Company (company) as the result of the action of the company in discontinuing mining operations at its Mayflower Mine near Keatley, Utah, and its prompt leasing of the premises to 69 of its 170 former employees. We then held, as far as presently pertinent, that jurisdiction existed in the trial court to determine whether the company's action constituted a breach of the company-union labor contract and remanded the matter for further proceedings in accord with our view that (273 F.2d at page 357):

"* * * the Company may quit business and lease its operations to third parties, including former em-

ployees, provided there is a clean break between the cessation of operations and the leasing arrangement. The leasing arrangement must not be a subterfuge for evading obligations under the bargaining contract. It means then that the court should scrutinize the leasing contracts in the context in which they were executed to determine whether the Company actually quit business and relinquished management and control of its operations, or whether by the terms and conditions of the leasing agreements the Company actually retained management and control of the mining operations—in short, whether the parties did, in good faith, effect a lessor-lessee relation. In the determination of the ultimate question we will of course look to the policy of Section 301 to 'promote a higher degree of responsibility upon the parties to such [bargaining] agreements, and * * * thereby promote industrial peace.' Textile Workers Union of America v. Lincoln Mills, supra [353 U.S. 448, 77 S.Ct. 912, 917, 1 L.Ed.2d 972]."

Upon remand, the trial court found that in the total circumstances there was no clean break between the company and its employees and that as a result the company had breached the union contract. Damages were set at $2,345, the net amount of union dues required by a check off provision in the labor contract for the union employees working during the period in question. An additional claim of damages for attorneys' fees was refused.

The company appeals, asserting error in the trial court's determination of both liability and damages and the union cross-appeals upon the matter of attorneys' fees.

The appellant company does not now attack the findings of fact, either evidentiary or ultimate, as found by the trial court but contents itself with the assertion that the judgment is unfounded in law and contrary to the law of the case as contained in our earlier decision. Vital to the company's argument is the claim that the union contract cannot be breached unless the leasing arrangement was pure sham or unless the relationship of employer-employee continued for all purposes in spite of the leasing arrangement. And, indeed, our earlier opinion clearly indicated that the bargaining contract could be invaded by subterfuge and that the trial court should explore the relationship of the parties to determine whether form constituted an artificial shelter for the true status of the company and its former employees. If the limited premise advanced by the company were sound it would follow that the judgment could not stand for the trial court was convinced, and found, that the decision of the company to close the mine on September 27, 1957, was made in good faith and for sound economic reasons; that the prompt rescinding of such decision on October 3, 1957, and the entering into the leasing arrangement with its employees was not motivated by the specific purpose of frustrating the labor agreement; and that such leasing arrangement, under other circumstances, would "have effected a normal relationship of lessor-lessee and/or independent contractor * * *."

However we believe the company's argumentative premise to be too limited. The existence of sham or the actual continuation of a complete employer-employee relationship would of course leave the bargaining contract with the union in full force and effect. So, too, would any agreement with its union employees which, when viewed in light of Sec. 301 of the Labor Management Relations Act of 1947, 61 Stat. 156, 29 U.S. C.A. § 185, has the underlying purpose and legal effect of leaving the company in control of the mine operations without a clean break from the normal employee method admittedly subjected to the union contract. Such was the specific holding in our consideration of this case upon first appeal and, so viewed and applied by the trial court, forms the basis for liability in the instant case in light of the fol-

lowing undisputed indicia of control retained by the company:

(1) The direction and control of exploration and development of the undeveloped ore below the 1880-foot level remained in the lessor with the lessees working there on contract basis.

(2) Supplies were purchased by and in the name of the mining company.

(3) The lessees were not paid as on contract for work accomplished or upon an accounting of profit, but upon the amount of time spent at the mine.

(4) (5) Specialized and technical crafts were performed by the company's payroll employees and their salaries proportionately charged against the lessees' operating costs.

(6) All ores were refined and marketed in the company's name.

(7) An accountant of the mining company also kept the books of the lessees and was a required co-signer on all checks, withdrawals and disbursements made by the lessees.

(8) The Workman's Compensation Policy continued to be issued to the company without an endorsement of the lessees' interest.

(9) The mining company guaranteed an accommodation loan of $5,000 to the lessees to enable them to meet their first payroll.

(10) Although $26,875.09 in undistributed profit had accumulated by February 1960, the lease manager, his assistant and the board of directors of the lessees were unaware of their rights to participate in the accumulated surplus and filed no partnership income tax returns for 1957, 1958, or 1959.

(11) The company maintained the right to terminate the lease agreement upon the payment of. $5,000, regardless of interests built up by the lessees. Additionally, the lessees did not acquire any interest in the ores developed by them on the 2005-foot level.

In addition to these enumerated controls, the trial court separately found that the lessees were made dependent upon the company officers and continually influenced by them by reason of the lack of business experience on the part of the lessees. The lessees who retired or resigned from the lease arrangement were not advised as to their share of undistributed profits and were required to assign and waive all rights and interests in the lease partnership. And, even assuming that the company laid no claim to the undistributed profits of the mining operation, the company benefited by the arrangement in that it was able to continue its exploration and development work at the lower levels and obtain a favorable DMEA * loan for that purpose. Had the mining company flooded the Mayflower Mine pursuant to its closedown order of September 27, 1957, this further exploration would have been impossible until the company had first pumped out and reclaimed the flooded mine at an expense estimated to be $100,000.

Viewed idealistically, the arrangement between the company and the employee-lessees indicates a mutual loyalty and a desire to cooperate to the advantage of both. Viewed pragmatically, the plan clearly gave work and incentive to 69 employees who otherwise faced the uncertainty of job change and yet allowed the company to avoid complete shutdown and resultant opening expense should the depressed metal market recover and allow normal operation. Viewed realistically, and as the trial court found, the company remained in control of the operations, the employee-lessees had no separate protectable interests and expected and received no more than a daily wage based upon actual hours of service and without regard to profit. And viewed legalistically, the plan thus invaded the terms of the company-union contract and

* Defense Minerals Exploration Agency Program of the Department of the Interior.

properly formed the basis for liability in the instant suit.

■■ The appellant company's claim that the award of damage equivalent to the check-off requirement in the union contract for the 69 employees working under the leasing arrangement is speculative in nature because, so says the company, there would have been nothing to check off if the company had completely shut down, merely argues what "might have been" and is without merit. Similarly, the union contention by cross-appeal that the judgment should include attorneys' fees finds no support in the cases. Attorneys' fees are not ordinarily recoverable absent a statutory or contract right or unless the cost is an inherent element of the breach of contract itself. Such is not this case.

Affirmed.