**Frank GUIDO, Plaintiff-Appellant,**

**v.**

**CITY OF SCHENECTADY, George B. Reynolds, Raymond Wemple, Defendants-Appellees.**

**No. 30, Docket 31217.**

United States Court of Appeals Second Circuit.

Argued Sept. 20, 1967.

Decided Nov. 25, 1968.

Waterman, Circuit Judge, dissented.

Michael J. Palmiotto, Schenectady, N. Y. (Adam F. Ciesinski, Schenectady, N. Y., on the brief), for defendants-appellees, City of Schenectady and Raymond Wemple.

Winifred C. Stanley, Albany, N. Y. (Louis J. Lefkowitz, Atty. Gen. of State of N. Y., Ruth Kessler Toch, Sol. Gen., Albany, N. Y., on the brief), for defendant-appellee George B. Reynolds.

Neil Fabricant, Melvin L. Wulf, Joshua Koplovitz, New York City, on the brief, for American Civil Liberties Union and New York Civil Liberties Union, amici curiae.

Before LUMBARD, Chief Judge, and WATERMAN and FEINBERG, Circuit Judges.

LUMBARD, Chief Judge:

In July, 1958 Frank Guido was convicted in Schenectady Police Court of being a common gambler. The conviction was based on wiretap evidence of telephone conversations to which he was a party. In 1960 he brought suit in the Northern District to recover over $10,000 in damages allegedly resulting from the introduction of the wiretap evidence in the State trial, in violation of Section 605 of the Federal Communications Act of 1934, 47 U.S.C. § 605. Chief Judge Foley dismissed the complaint and entered judgment for defendants. We affirm.

During an investigation of gambling within the City of Schenectady, the Schenectady police department, pursuant to New York Code of Criminal Procedure § 813–a, applied for an order to tap a telephone which it had reason to believe was being used for bookmaking activity. An ex parte order was granted by a New York Supreme Court Justice on March 26, 1958. Thereafter, telephone conversations of plaintiff-appellant Guido were recorded by defendant-appellee Raymond Wemple, a Schenectady police officer, with the technical assistance of defendant-appellee George B. Reynolds, a New York State Trooper assigned to make the tap by the Chief In-

Joseph Harris, Albany, N. Y. (Ungerman & Harris, Albany, N. Y., on the brief), for plaintiff-appellant.

spector of the State Bureau of Criminal Investigation.

Recordings of the conversations in which Guido was involved were introduced in evidence at his trial in Schenectady Police Court, over the objection of his attorney. On July 24, 1958, Guido was convicted of being a common gambler in violation of New York Penal Law, McKinney's Consol.Laws, c. 40, § 970. He was sentenced to a term of 6 months in Schenectady County Jail and fined $500. An appeal from the conviction was dismissed on motion for failure to perfect. Plaintiff then applied for a state writ of habeas corpus. Ultimately the Court of Appeals denied the writ. People ex rel. Guido v. Calkins, 9 N.Y.2d 77, 211 N.Y.S.2d 166, 172 N.E.2d 549 (1961), reversing 10 A.D.2d 510, 200 N.Y.S.2d 907 (3rd Dept. 1960), reversing 13 Misc.2d 791, 178 N.Y.S.2d 385 (1958).

In the present civil action for damages, Guido contends that defendants violated § 605 by intercepting and disclosing at the state trial, without permission, the contents of telephone conversations to which he was a party. He seeks to recover damages for the 153 days he spent in jail and the $500 fine he paid. He also seeks to recover $10,000 in counsel fees that he allegedly orally agreed to pay to the attorney who represents him in this action for representing him in all of the state court proceedings. Finally Guido seeks to recover for damage to his reputation resulting from the disclosure.

Judge Foley found that the greatest emphasis in the suit was placed upon recovery of the $10,000 in counsel fees, only $800 having been paid and the rest alleged to be due and owing. He held that since defendant State Trooper Reynolds did not divulge or publish he did not violate § 605 and was not liable.

He extended immunity from civil damages to defendant Officer Wemple whom he found to be acting within the scope of, and pursuant to, governmental authority, without malice. He found no proof in the record that would provide a rational basis for the ascertainment of damages, and held that counsel fees could not be awarded in the absence of an express provision in § 605 providing for awarding counsel fees. For these reasons he dismissed the complaint.

■ Since this action is an implied private right of action arising out of a violation of a criminal statute, the same doctrines of law must be applied in deciding this appeal that would be applied if it were a criminal case arising from a violation of the statute in 1958. In Schwartz v. Texas, 344 U.S. 199, 73 S. Ct. 232, 97 L.Ed. 231 (1952) the Supreme Court considered the question whether, despite § 605, telephone communications intercepted by state officers could lawfully be received in evidence in state criminal trials and concluded that state trial courts were not required to reject such evidence. While Guido's appeal was under consideration by this court, the Supreme Court overruled *Schwartz* and held that evidence obtained in violation of § 605 is inadmissible in state criminal trials. Lee v. Florida, 392 U.S. 378, 88 S.Ct. 2096, 20 L.Ed.2d 1166 (1968). However, the court has recently held in Fuller v. Alaska, 393 U.S. 80, 89 S.Ct. 61, 21 L.Ed.2d 212 (October 28, 1968), that *Lee* was to apply prospectively only. This result, the Court stated, was required in light of the states' good faith reliance on *Schwartz* and because the principal upon which *Lee* was decided did not require retroactive application.[1] In light of this decision, I feel that the doctrine of *Schwartz* should be applied

---

1. "Moreover, the States have justifiably relied upon the explicit holding of Schwartz that such evidence was admissible.

Retroactive application of Lee would overturn every state conviction obtained in good-faith reliance on Schwartz. Since this result is not required by the principle upon which Lee was decided, or necessary to accomplish its purpose, we hold that the exclusionary rule is to be applied only to trials in which the evidence is sought to be introduced after the date of our decision in Lee." Fuller v. Alaska, 393 U.S. at 81, 89 S.Ct. at 62.

to the case before us, since it was the controlling Supreme Court precedent at the time that Guido was convicted through the use of wiretap evidence.

While this court has held that there is an implied private right of action for damages arising out of violation of § 605, Reitmeister v. Reitmeister, 162 F.2d 691 (2d Cir. 1947), the scope of the civil liability created by the statute has never been defined. See Lee v. Florida, 392 U.S. at 387, 88 S.Ct. 2096 (Mr. Justice Black, dissenting). It would be a significant expansion of the scope of § 605 under the doctrine of Schwartz v. Texas, supra, to permit a defendant who was convicted in a state criminal proceeding on the basis of wiretap evidence to recover as damages under § 605 his counsel fees, fines levied against him and damages resulting from incarceration. I believe that the principles of statutory construction which must be applied in defining the scope of civil liability created under the Schwartz v. Texas interpretation of § 605 do not permit recovery of these elements of damages by defendants in cases tried prior to the decision of Lee v. Florida.

In *Schwartz*, the Court held that even if the disclosure of the evidence violated § 605, that section did not render the evidence inadmissible in state courts where state law permitted the use of such evidence. The Court said:

> "Where a state has carefully legislated so as not to render inadmissible evidence obtained and sought to be divulged in violation of the laws of the United States, this Court will not extend by implication the statute of the United States so as to invalidate the specific language of the state statute. If Congress is authorized to act in a field, it should manifest its intention

clearly. It will not be presumed that a federal statute was intended to supersede the exercise of the power of the state unless there is a clear manifestation of intention to do so. The exercise of federal supremacy is not lightly to be presumed." 344 U.S. 202–203, 73 S.Ct. 235.

The wiretap in this case was carried out pursuant to a state court order authorized under § 813–a of the New York Code of Criminal Procedure, which was clearly valid state law at the time of Guido's conviction.[2] In Pugach v. Dollinger, 365 U.S. 458, 81 S.Ct. 650, 5 L.Ed. 2d 678 (1961), affirming 277 F.2d 739 (2d Cir. 1960), the Court held, on the basis of *Schwartz*, that a federal court would not enjoin the use in state criminal proceedings of wiretap evidence obtained under a similar court order.

To construe a statute which is entirely silent upon the question of civil damages against state officials for wiretapping pursuant to a court order authorized under state law as providing an action against state officials for damages flowing from plaintiff's trial and conviction at a time when the Supreme Court had refused to construe the statute as prohibiting introduction of the wiretap evidence at the trial, would accomplish indirectly the result which the Supreme Court had refused to reach directly in *Schwartz* and *Pugach*. In those cases the Court determined that Congress did not intend § 605 to preclude the use of wiretap evidence in state courts. See Lee v. Florida, 392 U.S. at 387–388, 88 S.Ct. 2096 (Mr. Justice Black, dissenting); id. at 388–389, 88 S.Ct. 2096 (Mr. Justice Harlan, dissenting). Permitting recovery of these elements of damages would have been a serious deterrent to the use of the wiretap evidence and, as

---

**2.** The question whether the order in the present case would have met Fourth Amendment standards is not before us. At the time of the trial in this case in 1958, it was settled law, under Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949) that the Constitution did not require the exclusion of unconstitutionally seized evidence in state trials. Although Mapp v. Ohio, 368 U.S. 871, 82 S.Ct. 23, 7 L.Ed.2d 72 (1961), later reversed this ruling, it was held not to be retroactive. Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601; United States ex rel. Angelet v. Fay, 333 F.2d 12 (2d Cir. 1964).

a practical matter, would have prevented the states from introducing such evidence at trial. I believe this would have been an unwarranted extension of the statute in the light of the *Schwartz* and *Pugach* decisions.

The only damage which Guido claims other than legal fees, fines and losses due to incarceration, is damage to his reputation resulting from the disclosure itself. On the record before us I cannot say that Judge Foley's finding that there was no credible evidence to support this claim is clearly erroneous. As the trial judge noted, Guido had been a law violator since 1933 and has been imprisoned a number of times, including a six month sentence in 1950 for unlawful purchase of heroin and a four year sentence after being convicted by a jury of unlawful sale of heroin in 1951. I agree with the trial judge that "with a background such as this, claim for damages for injury to reputation or mental upset taxes credulity somewhat."

The judgment is affirmed.

FEINBERG, Circuit Judge (concurring):

In 1958, when the wiretap in this case occurred and the information thereby obtained was disclosed, the controlling decision was Schwartz v. Texas, 344 U.S. 199, 73 S.Ct. 232, 97 L.Ed. 231 (1952). Under that case, wiretap evidence obtained by local police officials in violation of 47 U.S.C. § 605 could be introduced against a defendant in a state criminal trial and this court could not interfere. See Pugach v. Dollinger, 365 U.S. 458, 81 S.Ct. 650, 5 L.Ed.2d 678 (1961), aff'g 277 F.2d 739 (2d Cir. 1960). According to the Supreme Court in Benanti v. United States, 355 U.S. 96, 101, 78 S.Ct. 155, 2 L.Ed.2d 126 (1957), the rationale of Schwartz v. Texas was

> that despite the plain prohibition of Section 605, due regard to federal-state relations precluded the conclusion that Congress intended to thwart a state rule of evidence in the absence of a clear indication to that effect.

The resulting clash between state law enforcement officers and federal law has been described as

> an absolute impasse going so far as to be almost ludicrous if the issue were not so fundamentally serious.

See Pugach v. Dollinger, 277 F.2d 739, 747 (2d Cir. 1960) (Clark, J., dissenting), aff'd, Pugach v. Dollinger, supra. And until recently that was the state of the law, however much some of us might have disagreed with it. See United States ex rel. Rosado v. Flood, 394 F.2d 139, 141 (2d Cir.), cert. denied, 393 U.S. 855, 89 S.Ct. 111, 21 L.Ed.2d 124 (U.S. Oct. 15, 1968).

Earlier this year, Lee v. Florida, 392 U.S. 378, 88 S.Ct. 2096, 20 L.Ed.2d 1166 (1968), overruled Schwartz v. Texas, supra. More recently, Lee v. Florida was held to be prospective only. Fuller v. Alaska, 393 U.S. 80, 89 S.Ct. 61, 21 L.Ed.2d 212 (U.S. Oct. 28, 1968). These new developments are not directly dispositive of the principal issue before us, which is whether Guido has the right to recover damages from local police officials or their governmental employers for the use in 1958 of wiretap evidence. However, they lend support to my basic view on how properly to deal with the civil liability alleged here, growing out of the prior chaotic state of the law. Since section 605 was being construed by the Court in 1958 to allow these defendants to introduce such evidence against Guido, it does not make sense to me ten years later to construe the same section as then simultaneously subjecting defendants to liability for damages to Guido for doing so.

On that basis, I concur. I express no view as to the proper elements of damage in Guido's action.

WATERMAN, Circuit Judge (dissenting):

I dissent from the result reached by my colleagues in affirming the dismissal of plaintiff's action against all three defendants.

As indicated in my brothers' opinions, it is essential to an understanding of this case to set forth with particularity certain essential dates. The comprehensive Federal Communications Act of 1934 passed by Congress became law on June 19, 1934. It is now codified as Chapter 5, Sections 151–609 of Title 47 of the United States Code. 47 U.S.C. § 605 provides in pertinent part:

* * * no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person * * *.

Section 501 provides the general penalty to be imposed upon a violator of the provisions of the Act.[1] In 1938 the State of New York held a constitutional convention and the convention adopted an amendment to the Bill of Rights of that constitution which, upon being submitted to the people for vote, was approved by the people on November 8, 1938. This provision is now Article 1, Section 12 of the New York State Constitution, and its entire language appears in the margin.[2]

In 1942 New York adopted a statute implementing this constitutional provision, which as amended in 1957, became Section 813–a of the Code of Criminal Procedure of New York State. Its provisions during the times here pertinent are fully quoted in the margin.[3]

1. § 501. General penalty.
Any person who willfully and knowingly does or causes or suffers to be done any act, matter, or thing, in this chapter prohibited or declared to be unlawful, or who willfully and knowingly omits or fails to do any act, matter, or thing in this chapter required to be done, or willfully and knowingly causes or suffers such omission or failure, shall, upon conviction thereof, be punished for such offense, for which no penalty (other than a forfeiture) is provided in this chapter, by a fine of not more than $10,000 or by imprisonment for a term not exceeding one year, or both * * *.

2. § 12. [Security against unreasonable searches, seizures and interceptions.]
The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
The right of the people to be secure against unreasonable interception of telephone and telegraph communications shall not be violated, and ex parte orders or warrants shall issue only upon oath or affirmation that there is reasonable ground to believe that evidence of crime may be thus obtained, and identifying the particular means of communication, and particularly describing the person or persons whose communications are to be intercepted and the purpose thereof.

3. § 813–a. Ex parte order for interception, overhearing or recording
An ex parte order for the interception, overhearing or recording of telegraph or telephonic communications may be issued by any justice of the supreme court or judge of a county court or of the court of general sessions of the county of New York upon oath or affirmation of a district attorney, or of the attorney-general or of an officer above the rank of sergeant of any police department of the state or of any political subdivision thereof, that there is reasonable ground to believe that evidence of crime may be thus obtained and identifying the particular telephone number or telegraph line, and particularly describing the person or persons whose communications are to be intercepted, overheard or recorded and the purpose thereof. In connection with the issuance of such an order the justice or judge may examine on oath the applicant and any other witness he may produce and shall satisfy himself of the existence of reasonable grounds for the granting of such application. Any such order shall be effective for the time specified therein but not for a period of more than two months unless extended or renewed by the justice or judge who signed and issued the original order upon satisfying himself that such extension or renewal is in the public interest. Any such order together with the papers upon which the application was based, shall be delivered to and retained by the applicant as authority for intercepting, overhearing or recording, or directing the interception, overhearing or recording of the telegraphic or telephonic communications

In 1949 the United States Supreme Court decided Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782, in 1952 decided Schwartz v. Texas, 344 U.S. 199, 73 S.Ct. 232, 97 L.Ed. 231, and in 1957 Benanti v. United States, 355 U.S. 96, 78 S.Ct. 155, 2 L.Ed.2d 126. The applicability of these three decisions is discussed in this opinion infra.

On March 26, 1958 a New York Supreme Court Justice issued the wiretap order involved here. On April 14, 1958 the defendant officers perfected the wiretap by which telephone conversations were intercepted until April 23, 1958. Thereafter, Guido was informed against and charged with being a common gambler by aiding and abetting the operation of a gambling establishment located at the wiretapped address. A jury trial began in the Schenectady City Police Court on July 22, 1958. During this trial Officer Wemple testified to having intercepted and taped the tapped telephone conversations, and he divulged the contents thereof in open court. Trooper Reynolds testified to having connected the interception wires "to the telephone line bearing number FR 2–5030 and hooked up to the recording equipment that automatically recorded any telephone conversation on that telephone line." He explained in detail how this intercepting equipment was set up by him in the basement of a private home. The entire operation was somewhat similar to that explained in Lee v. Florida, 392 U.S. 378, 379–380, 88 S.Ct. 2096, 20 L.Ed.2d 1166. The wire tapped here, however, was a private wire rather than a party-line as in Lee. On July 24, 1958, after a jury verdict of guilty, Guido was convicted and sentenced.

Though I agree with my brothers that the law to be applied here is the law governing the rights of the parties in midsummer 1958, it should also be noted that the suit out of which this appeal arose was commenced in the Northern District of New York on July 22, 1960, almost two years after the conclusion of plaintiff's criminal trial.

Guido did not appeal his conviction but adopted the post-conviction remedy of habeas corpus, in which the only issue presented was whether the information was sufficient to state a crime; and, on June 2, 1960, the Appellate Division of the Supreme Court of New York, Third Department, unanimously decided the habeas petition favorably to Guido and sustained the writ, People ex rel. Guido v. Calkins, 10 A.D.2d 510, 200 N.Y.S.2d 907 (1960). Meanwhile, on April 24, 1960 our court handed down its three in banc opinions in Pugach v. Dollinger, 277 F.2d 739 (2 Cir. 1960), affirmed per curiam, 365 U.S. 458, 81 S.Ct. 650, 5 L. Ed.2d 678 (1961). On July 22, 1960, after these June 2 and April 24 decisions, the plaintiff commenced his suit, but before the case was tried the New York Court of Appeals held that the information stated a crime and reversed the Appellate Division, 9 N.Y.2d 77, 211 N.Y.S. 2d 166, 172 N.E.2d 549 (1961).

When plaintiff's telephone conversations were intercepted and when the conversations were divulged it was the established law in this circuit that a criminal violation of § 605 gave rise to an implied civil right to recover damages in a civil suit, Reitmeister v. Reitmeister, 162 F.2d 691 (1947), where Judge Learned Hand stated at 694:

The first questions are whether the Communications Act of 1934, 47 U.S. C.A. § 151 et seq., imposes a civil, as well as a criminal, liability upon anyone who "publishes" a telephone message, and whether, if so, the District Court had jurisdiction over the action. Although the Act does not expressly create any civil liability, we can see no reason why the situation is not within the doctrine which, in the absence of contrary implications, construes a criminal statute, enacted for the pro-

transmitted over the instrument or instruments described. A true copy of such order shall at all times be retained

in his possession by the judge or justice issuing the same.

tection of a specified class, as creating a civil right in members of the class, although the only express sanctions are criminal.

Before plaintiff's suit was commenced we had cited and reaffirmed Reitmeister in Pugach v. Dollinger, supra 277 F.2d at 743, where the wiretap was made pursuant to New York State court authorization and in accord with the state statute.[4]

Having in mind, then, these historical facts, I now turn to a discussion of the grounds upon which I base my dissent. In their separate opinions my brothers build upon the doctrine of Schwartz v. Texas, supra, and hold that inasmuch as the doctrine of that case did not render evidence obtained by wiretap inadmissible in a state court where state law permitted its use, the defendant in a state criminal trial cannot sue the violator of § 605 who intercepted the defendant's conversations and divulged their contents.

I cannot go along with this innovation in common law, or with this repudiation of the law of this circuit set forth in *Reitmeister*, and in *Pugach*.

Of course I agree with my brothers that the taped intercepted conversations were admissible against Guido at Guido's criminal trial, but, inasmuch as these tapes were made unlawfully, the officers intercepting, taping, and divulging the conversations were prosecutable under the express language of Schwartz v. Texas and hence suable by Guido.

I believe that it is not only consistent with the pertinent Supreme Court decisions as of 1958 to permit one whose telephone conversations have been intercepted without his permission and the contents thereof divulged to obtain a judgment against the interceptors (unless prevented from doing so because of the interceptors' immunity from suit), but such judgments must be obtainable if the laws passed by Congress are not to be wilfully disregarded by state officials who base their lack of compliance therewith upon state constitutional provisions and state statutes that have been interpositioned after the Acts of Congress have become federal law. Therefore, I do not agree that it would be improper for Guido to obtain a judgment against the officers who violated Section 605 of the Federal Communications Act of 1934 by acting pursuant to § 813-a of the New York Code of Criminal Procedure which was a "valid law" in New York State at the time of appellant's conviction, although it had been passed 8 years after the Act of Congress had preempted the field. By no stretch of one's imagination can it be contended that § 813-a, whether or not a valid law at the time of appellant's conviction, insulates a violator of Section 605 from the consequences of that violation. The New York law, passed in 1942 and amended in 1957, directly conflicts with § 605 of the Federal Communications Act, passed by Congress in 1934. In such posture we need only to turn to Article VI of the United States Constitution. " * * * This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; * * * shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the *Constitution or Laws of any State* to the Contrary notwithstanding." (Emphasis supplied.) The analysis required and the result dictated whenever a state law would permit what a valid Act of Congress would prohibit was definitely stated nearly one hundred fifty years ago by Chief Justice Marshall in the well-known leading case of McCulloch v. Maryland, 4 Wheat. 316, 17 U.S. 316, 1819):

> If any one proposition could command the universal assent of mankind, we might expect it would be this: that the government of the Union, though

---

4.  Other federal courts have also recognized that a civil action may be based upon a violation of Section 605. See Huff v. Michigan Bell Telephone Co., 278 F.Supp. 76 (E.D.Mich.1967); KMLA Broadcasting Corp. v. Twentieth Century Cigarette Vendors Corp., 264 F.Supp. 35 (C.D.Cal. 1967).

limited in its powers, is supreme within its sphere of action. This would seem to result necessarily from its nature. It is the government of all; its powers are delegated by all; it represents all, and acts for all. Though any one State may be willing to control its operations, no State is willing to allow others to control them. The nation, on those subjects on which it can act, must necessarily bind its component parts. But this question is not left to mere reason: the people have, in express terms, decided it, by saying, "this constitution, and the laws of the United States, which shall be made in pursuance thereof," "shall be the supreme law of the land," and by requiring that the members of the State legislatures, and the officers of the executive and judicial departments of the States, shall take the oath of fidelity to it. The government of the United States, then, though limited in its powers, is supreme; and its laws, when made in pursuance of the constitution, form the supreme law of the Land, any thing in the constitution or laws of any State to the contrary notwithstanding. 17 U.S. at 405.

Thus the application of basic, fundamental principles of our federalism demonstrates that § 813–a of the New York Code of Criminal Procedure which gives apparent state statutory authority to violate the integrity of telephonic communication, a violation which § 605 of the Federal Communications Act specifically prohibits, would seem to be of no legal force at the time of the Reynolds-Wemple wiretap and of appellant's conviction. But the state officials involved in this case were not required to search out these principles; the U. S. Supreme Court did it for them on December 9, 1957 in Benanti v. United States, 355 U.S. 96, 103–106, 78 S.Ct. 155, 2 L.Ed.2d 126 (1957) which, as noted earlier, had been decided after Schwartz v. Texas and was handed down four months before the state wiretap order in this case was issued. *Benanti* made it crystal clear that state officers who intercept and divulge

telephone communications violate § 605 and that state laws permitting wiretapping cannot stand alongside § 605. The opinion was handed down by Chief Justice Warren, speaking for a unanimous Supreme Court. The Government had urged:

> * * * that the interception and divulgence in this case were no violation of Section 605 because the wiretap was placed by state agents acting in accordance with the law of New York.

In disposing of this argument the Chief Justice went on to say:

> The Constitution and statutes of the State of New York provide that an ex parte order authorizing a wiretap may be issued by judges of a certain rank upon the oath or affirmation of certain officials that there is reasonable ground to believe evidence of a crime may be obtained and which identifies the telephone line and the persons who are to be affected thereby. It is undisputed that an order pursuant to that law was issued in this case and that it was executed according to state law.

> Respondent does not urge that, constitutionally speaking, Congress is without power to forbid such wiretapping even in the face of a conflicting state law. Cf. Weiss v. United States, 308 U.S. 321, 327, 60 S.Ct. 269, 271, 84 L.Ed. 298. Rather the argument is that Congress has not exercised this power and that Section 605, being general in its terms, should not be deemed to operate to prevent a State from authorizing wiretapping in the exercise of its legitimate police functions. However, we read the Federal Communications Act, and Section 605 in particular, to the contrary.

> The Federal Communications Act is a comprehensive scheme for the regulation of interstate communication. In order to safeguard those interests protected under Section 605, that portion of the statute pertinent to this case applies both to intrastate and to interstate communications. * * * Congress did not intend to place the

protections so plainly guaranteed in Section 605 in such a vulnerable position. Respondent points to portions of the Act which place some limited authority in the States over the field of interstate communication. The character of these matters, dealing with aspects of the regulation of utility service to the public, is technical in nature in contrast to the broader policy considerations motivating Section 605. Moreover, the very existence of these grants of authority to the States underscores the conclusion that had Congress intended to allow the States to make exceptions to Section 605, it would have said so. In light of the above considerations, and keeping in mind this comprehensive scheme of interstate regulation and the public policy underlying Section 605 as part of that scheme, we find that Congress, setting out a prohibition in plain terms, did not mean to allow state legislation which would contradict that section and that policy. Cf. Com. of Pennsylvania v. Nelson, 350 U.S. 497, 76 S.Ct. 477, 100 L.Ed. 640; Hill v. State of Florida, ex rel. Watson, 325 U.S. 538, 65 S.Ct. 1373, 89 L.Ed. 1782; Hines v. Davidowitz, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581.[19] 355 U.S. 105–106, 78 S.Ct. 159.

Footnote 19 reads as follows:

> [19] Schwartz v. State of Texas, supra, is not to the contrary. While it refused to overturn a state rule of evidence, the Court was satisfied that the action of the state officials nonetheless violated § 605. 344 U.S. at page 202, 73 S.Ct. at page 234.

By this unanimous opinion the Court disposed of the theory that Congress had not intended by its comprehensive Federal Communications Act to exercise its powers under the Supremacy Clause, apparently questioned by my brother Lumbard in the quotation from Schwartz v.

Texas that appears in his opinion. Also, any argument that Schwartz v. Texas could be relied upon by New York State officers to protect them from the consequences flowing from a § 605 violation was just as surely dissipated.[5]

By 1958 Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), was the only support for the *Schwartz* decision that evidence illegally obtained in violation of § 605 by tapping a defendant's telephone is admissible against him at his trial. This year, the Supreme Court recited that obvious fact: "After the *Benanti* decision, therefore, the only remaining support for Schwartz v. Texas, supra, was the holding in Wolf v. People of the State of Colorado, supra * . * *." Lee v. Florida, 392 U.S. 378, 385, 88 S.Ct. 2096, 2100, 20 L.Ed.2d 1166 (1968).

Indeed, Wolf v. Colorado, supra, had vitality in 1958, and, I submit, my brothers grievously err in that they both misunderstand the relationship that its vitality bore to situations such as the one we are now discussing. In the *Wolf* case itself that relationship was spelled out. The case held that the Supreme Court, despite the federal exclusionary rule of Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), was not impressing the exclusionary rule upon those states that were not prepared to bar in state prosecutions the use of evidence secured through illegal means. In justifying the Court's position, Justice Frankfurter, speaking for the majority, stated at 30–31 of 338 U.S., at 1362 of 69 S.Ct.; "The jurisdictions which have rejected the Weeks doctrine have not left the right to privacy without other means of protection," and pointed out in one lengthy footnote the common law rule that the officer-violator may be sued for damages, and in another footnote quoted *in extenso* the eloquent opinion of Judge Cardozo in People v. Defore,

5. See Barton, Law-Enforcement Wiretap Policy in the United States, 2 Crim.L. Bull. (No. 1) 15, 21–22 (1966). Also see Schwartz, The Wiretapping Problem Today, 2 Crim.L.Bull. (No. 10) 3, 6–7 (1966); George, The Potent Omnipresent Teacher: The Supreme Court and Wiretapping, 47 Va.L.Rev. 751, 768–769 (1961).

242 N.Y. 13, 150 N.E. 585, which I mention later in this opinion. Also see entire dissenting opinion of Justice Murphy in *Wolf*. Thus in 1958 in dealing with wiretaps by officers who acted under color of state authority but who in so doing violated § 605, the Supreme Court did not demand that the inculpatory evidence thus obtained had to be excluded in a New York state criminal prosecution. However, this does not mean that it was thought that the courts had any obligation to protect from the consequences of their unlawful acts those officers of the law who violated the law in their zeal to obtain convictions.

The securing of incriminating evidence by indiscriminately taping the words of all users of a telephone connection is reminiscent of the officious acts of officers who conducted indiscriminate searches and seizures by physical trespass in order to secure unspecified incriminating evidence. Justice Frankfurter in writing Wolf v. Colorado surely had in mind the proud history of commoner resistance to such searches and the independent integrity of common law judges and juries, who, despite the wishes of the Crown, gave handsome recoveries to commoners so trepassed upon.

As noted in Wolf v. Colorado, as long ago as 1763 the British courts were permitting private citizens to recover damages from constable-like representatives of the king who, while armed with official authorization to do so, extensively searched citizens' homes and persons, and examined at will, pursuant to the hated Writs of Assistance, citizens' unspecified private papers and then took them away in the belief that somewhere in the papers incriminating words of suspects might be found which a criminal court judge and jury would listen to when read to them. Wilkes v. Wood, 98 Eng.Rep. 489 (1763); Huckle v. Money, 2 Wils. 205, 95 Eng.Rep. 768 (K.B.1763); Entick v. Carrington, 2 Wils. 275, 95 Eng.Rep. 807 (K.B. 1765); Money v. Leach, 3 Burr. 1742, 97 Eng.Rep. 1075 (1765).[6] The right of a citizen to bring a civil action for consequential damages against a police officer for his illegal activity in the obtaining of evidence admissible against the citizen in a criminal action but which the officer obtained by an invasion of a citizen's rights has also proudly been carried forward in American jurisprudence as one of the truly fundamental rights of American citizens. See, for example, statements by well-known judges as in Boyd v. United States, 116 U.S. 616, 624–630, 6 S.Ct. 524, 29 L.Ed. 746 (1886) (Bradley, J.), where Lord Camden's opinion in Entick v. Carrington is extensively quoted and enthusiastically approved; Olmstead v. United States, 277 U.S. 438, 463, 48 S.Ct. 564, 72 L.Ed. 944, 66 A.L.R. 376 (1928) (Taft, C. J.,); Wolf v. Colorado, supra, 338 U.S. 29–33, 69 S.Ct. 1359 (Frankfurter, J.), and cases there cited; Reitmeister v. Reitmeister, supra, 162 F.2d 694, (L. Hand, J.); Irvine v. California, 347 U.S. 128, 137–138, 74 S.Ct. 381, 98 L.Ed. 561 (1954) (Jackson, J.); Pugach v. Dollinger, supra, 277 F.2d 743–744 (Lumbard, Ch. J.). See also Foote, Tort Remedies for Police Violations of Individual Rights, 39 Minn.L.Rev. 493 (1955).

And of course this has always been the law of New York: see People v. Defore, 242 N.Y. 13, 150 N.E. 585 (1926) where Judge Cardozo, at 19, at 586 of 150 N.E., speaking for a unanimous court, stated:

> We hold, then, with the defendant that the evidence against him was the outcome of a trespass. The officer might have been resisted, or sued for damages, or even prosecuted for oppression. Penal Law, §§ 1846, 1847. He was subject to removal or other discipline at the hands of his superiors. These consequences are undisputed. The defendant would add another. We must determine whether evidence of criminality, procured by an act of trespass, is to be rejected as incom-

---

6. In these four actions the plaintiffs recovered, respectively, £5,000, £300, £2,000, and £2,000. And this was long before devalution!

petent for the misconduct of the trespasser.

And then refused to adopt an exclusionary rule, called by Judge Cardozo a "new doctrine," because the court could not bring itself to hold that "The criminal is to go free because the constable has blundered." Id. at 21, 150 N.E. at 587.

In 1958 the pious hope expressed in Schwartz v. Texas, supra, 344 U.S. at 201, 73 S.Ct. at 234, that "Enforcement of the statutory prohibition in § 605 can be achieved under the penal provisions of § 501" sufficed to satisfy that an exclusionary rule binding upon the states was not necessary. As has been stated in Lee v. Florida, supra at 386, 88 S. Ct. at 2101, "That has proved to be a vain hope. Research has failed to uncover a single reported prosecution of a law enforcement officer for violation of § 605 since the statute was enacted." Needless to say, *Schwartz* in suggesting criminal prosecutions against state law officers did not suggest that civil suits would not lie against them. I submit that well founded suits against violators of § 605 have stated a cause of action in this circuit until today. Reitmeister v. Reitmeister, supra; Pugach v. Dollinger, supra.

Having established that (1) the New York wiretapping law was an interpositional law at the time of appellant's conviction, (2) that the officers in this case violated federal law, (3) that appellant has a civil action against the officers for damages which resulted as a consequence of their activity, and (4) that the payment of damages to appellant will not be contrary to the Supreme Court's decision in *Schwartz*, I will now turn to a discussion of the damage issue—the issue upon which Judge Foley professes to deny appellant any relief.

The civil right of an individual using a telephone to converse privately without having the conversation furtively intercepted, guaranteed to him by Section 605, is balanced by the criminal liability imposed upon persons who would inter-fere with an individual's private telephone communications. Reitmeister v. Reitmeister, supra. Therefore, it would seem obvious that any action by government agents which violates Section 605 and which could result in the imposition of criminal sanctions upon the agents also constitutes a tort against the party whose interest is protected by Section 605. See Reitmeister v. Reitmeister, supra; Pugach v. Dollinger, supra. However, since this civil remedy is an implied remedy, there is nothing in the Federal Communications Act specifying the damages recoverable for the personal tort. Accordingly, we should look to the general principles of tort law and the practice under federal Civil Rights legislation, 42 U.S.C. § 1983, to ascertain the kind of damages that might be recovered by the appellant in this case; a practice established in the federal courts when dealing with civil remedies based upon the violation of other federal rights. E. g., Scott v. Donald, 165 U.S. 58, 17 S.Ct. 265, 41 L.Ed. 632 (1897); Basista v. Weir, 340 F.2d 74, 86–88 (3 Cir. 1965); Wills v. Trans World Airlines, Inc., 200 F.Supp. 360, 366–368 (S.D.Cal.1961); cf. Wiley v. Sinkler, 179 U.S. 58, 21 S.Ct. 17, 45 L.Ed. 84 (1900).

First, it is beyond dispute that the violations of Section 605 in this case were wilful or intentional wrongs and not negligent wrongs. This being so, appellant is entitled at the very least to recover nominal damages in order to vindicate his rights under Section 605, regardless of whether he can show any actual damages. Basista v. Weir, supra; Tracy v. Robbins, 40 F.R.D. 108, 113 (D. S.C. 1966), appeal dismissed, 373 F.2d 13 (4 Cir. 1967); Washington v. Official Court Stenographer, 251 F.Supp. 945, 947 (E.D.Pa. 1966); Wilson v. Eberle, 18 F.R.D. 7, 9 (D.Alaska 1955); see, generally, 25 C.J.S. Damages §§ 8–16 (1966). It is immaterial that appellant did not allege nominal damages. As a matter of federal law, nominal damages need not be alleged; nominal damages are proved and recoverable when the plaintiff shows that he was deprived of a

federal right to which he was entitled. Basista v. Weir, supra 340 F.2d at 87.

Second, the appellant could well be entitled to exemplary damages even though the only other relief obtainable by him is an award of nominal damages. See Basista v. Weir, supra; Hague v. C.I.O., 101 F.2d 774, 789 (3 Cir.), modified on other grounds, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); Washington v. Official Court Stenographer, supra, Antelope v. George, 211 F.Supp. 657, 660 (D. Idaho 1962); Wills v. Trans World Airlines, supra, 200 F.Supp. at 367–368; cf. Scott v. Donald, supra. In his complaint appellant requested exemplary damages but the district court never reached this question because it granted *neither nominal nor compensatory damages.* Therefore, I would hold that this should have been considered with the caveat that in making this determination the district court should bear in mind that exemplary damages are ordinarily awarded a plaintiff only if the defendant is shown to have acted with malice or its equivalent. Scott v. Donald, supra; Lake Shore & Mich. Southern Ry. v. Prentice, 147 U.S. 101, 106–107, 13 S.Ct. 261, 37 L.Ed. 97 (1893).

Finally, I believe that appellant is entitled to some portion of the compensatory damages he claimed. In his complaint appellant requested compensatory *damages for alleged injury to his reputa-* tion, for mental distress, for attorney fees involved in defending the criminal prosecution, for attorney fees involved in the petition for habeas corpus and pursuing appellate procedures in the habeas corpus proceedings, for lost wages caused by his imprisonment pursuant to the gambling conviction, and for the amount of the fine imposed upon him as part of his sentence after the gambling conviction.

As to his claims for money damages to compensate for the injury to his reputation and for the kind of mental distress he proved here, distress at the humiliation his family had to suffer at the hands of society following his gambling conviction, I agree with the trial court and my brother Lumbard that, considering appellant's background, these claims tax credulity.[7] Also, compensatory damages to recover the fine and to compensate for the days of imprisonment are not recoverable, for the fine and the imprisonment, though the result of the wrongful police activity which produced admissible inculpatory evidence, were imposed by the trial judge after a jury verdict unimpeachably arrived at under New York law. The proximate cause of the fines and imprisonment was the judgment of conviction which was valid and final, Antelope v. George, supra; cf. Hoffman v. Halden, 268 F.2d 280, 296–297 (9 Cir. 1959). The question of attorneys' fees is quite a different matter. The trial judge did not grant this item of damage because he was of the belief that attorneys' fees could not be recovered unless there was statutory authorization for their recovery in a case of this type,[8]

---

7. However, there could be here some mental distress for which recovery perhaps could have been had if it had been pleaded and proved. Among the taped tapped conversations admitted into evidence at appellant's criminal trial were two between appellant and his wife, which had nothing to do with any gambling activities. I can understand that appellant upon hearing such conversations played on a recording device in open court might suffer embarrassment, humiliation, or fear from: (a) the intimate contents of those conversations, (b) the threat, now partially realized, that the prosecution might play back other conversations of an extremely intimate nature, or (c) the realization that the policemen who tapped actually recorded even more intimate conversations and might well have played them back for the amusement of other members of the team investigating appellant, even if only for the purpose of finding within those conversations criminally incriminating passages. This kind of personal uneasiness would be suffered, I think, by any person, whether one had a good or bad community reputation or had a prior criminal record.

8. Plaintiff is not seeking plaintiff's attorney's fees in the case presently before the federal courts and the learning relative to the denial of recovery for attorney's fees in cases the attorneys were then engaged

but this view is contrary to established authority in a case of this nature. While, as a general rule, in the absence of statutory authorization, attorneys' fees may not be recovered as part of the recoverable damages in a personal injury action, cf., New Park Mining Co. v. United Steelworkers of America, 288 F. 2d 225 (10 Cir. 1961), under some circumstances fair attorneys' fees and expenses of litigation in collateral proceedings may constitute proper elements of damage in the action in chief. See Safeway Rental & Sales Co. v. Albina Engine & Machine Works, 343 F.2d 129, 133 (10 Cir. 1965); Seaboard Surety Co. v. Permacrete Construction Corp., 221 F.2d 366, 371-372 (3 Cir. 1955); Mc-

Arthur v. Pennington, 253 F.Supp. 420, 429, 430-431 (E.D.Tenn.1963). What is required is proof that the plaintiff became involved in collateral litigation with others as a natural and probable consequence of the wrong committed by the defendant against the plaintiff. This appears to be the case here. The only items of evidence presented at appellant's criminal trial that connected him with gambling activities were the wiretap recordings and the fruits of a search conducted after a warrant was issued upon the affidavit of the Schenectady Chief of Police setting forth as his grounds for its issuance the information obtained by the wiretap interception.[9] I would therefore hold that the court below

---

in as attorneys for plaintiff is irrelevant to the issue here. The attorney's fees sought here are fees incurred in connection with the long-closed proceedings in the state courts. Obviously, there is no federal statutory authorization for the recovery of such fees, and if recoverable at all, the justification for the recovery must be found in applicable rules of the common law providing for the kind and amount of damages recoverable against tortfeasors.

9. The affidavit and the warrant issued pursuant thereto were introduced into evidence by the plaintiff as an exhibit. The affidavit is reproduced here in its entirety.

STATE OF NEW YORK ⎫
COUNTY OF SCHENECTADY ⎬ SS:
CITY OF SCHENECTADY ⎭

GEORGE F. MORRIS, being duly sworn, deposes and says:

That I am a Captain in the Police Department in the City of Schenectady, New York, and am presently assigned, with other police Officers, to the Special Service Squad of said Police Department to make confidential investigations in attempting to suppress all forms of unlawful gambling and vice in the City of Schenectady.

That at the present time Police Officers of the Special Service Squad are attempting to secure evidence of violations of the Penal Law of the State of New York, namely, keeping gaming and betting establishments in violation of Section 973 of the Penal Law of the State of New York, and/or keeping of a place

for the game of policy in violation of Section 974 of the Penal Law of the State of New York, and bookmaking, in violation of Section 986 of the Penal Law of the State of New York.

That heretofore, on March 26, 1958, on application of your deponent, an Order was made by Hon. Isadore Bookstein, Justice of the Supreme Court, permitting the interception of telephone conversations being transmitted over Schenectady telephone FRanklin 2-5030, being listed in the records of the New York Telephone Company to Herman Ricken at 813 Albany Street, Schenectady, New York. That said telephone is actually being used by Herman Ricken and/or "John Doe", the name "John Doe" being fictitious, his or her true name being unknown to me. That since the issuance of said interception order, telephone communications being transmitted over Schenectady telephone FRanklin 2-5030 have been intercepted by your deponent and other members of the Special Service Squad under the direction and supervision of your deponent, and have been recorded and transcribed and said transcript read by your deponent. That it is apparent from these transcripts that the said Herman Ricken, and/or "John Doe", and the name "John Doe" being fictitious, his or her true name being unknown to me, and/or others, are violating the Penal Law, in that they are taking and laying off bets on horse racing and receiving and giving race results and other racing information, and in the playing of the game of policy, and that the premises known as 813 Albany Street are used for the keeping of a gaming and bet-

should have considered the attorneys' fees damage item.

However, I would point out that appellant is not entitled to recover all of the attorneys' fees he seeks. Appellant chose collaterally to attack his conviction and did not directly appeal the original conviction. As a consequence, the conviction became a final judgment. Therefore, I believe that any attorneys' fees contracted after the conviction became final may not be recovered because appellant's failure to appeal operated as an independent, intervening, superseding cause.

The trial judge also concluded that Officer Wemple, though he violated Section 605, should have the benefit of immunity because he acted within the scope of and pursuant to government authority. However, the immunity of police officers at common law is not absolute and unqualified. Pierson v.

Ray, 386 U.S. 547, 555, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967).[10] See People v. Defore, supra. It is true that an officer may be excused from liability for acting under a statute that he then reasonably believed to be valid but which was later held to be unconstitutional on its face or as applied. Id. at 555, 87 S.Ct. 1213. But as I indicated above, in view of the forthright language quoted herein supra, in Benanti v. United States, neither Officer Wemple nor, for that matter, any other New York official reasonably could have believed that New York Code of Criminal Procedure § 813–a excused New York officers from civil liability for acts violative of § 605, and, in view of the hope expressed in Schwartz v. Texas, criminal liability under § 501 as well. Therefore, any reliance upon an immunity claim is misplaced and neither Officer Wemple nor Trooper Reynolds should be absolved from liability for any

---

ting establishment, all in violation of Sections 973, 974 and 986 of the Penal Law of the State of New York.

That it further appears that certain property, consisting of telephone equipment, records, racing sheets and other equipment generally used in taking of bets on horses and playing the game of policy, are in the possession of said Herman Ricken, and/or "John Doe", the name "John Doe" being fictitious, his or her true name being unknown, and/or others, at the premises commonly known as 813 Albany Street, Schenectady, New York.

That this affidavit is made for the purpose of obtaining a Search Warrant enabling a Peace Officer of the County of Schenectady to obtain possession of the property hereinbefore described.

GEORGE F. MORRIS

Sworn to before me this 21st day of April, 1958.

BETTY THORNTON

Commissioner of Deeds

10. The cases in which immunity has been accorded to judges and prosecuting attorneys, such as Yaselli v. Goff, 12 F.2d 396 (2 Cir. 1926), aff'd, 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1927) (per curiam); Gregoire v. Biddle, 177 F.2d 579 (2 Cir. 1949), cert. denied, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950); Simons v. O'Connor, 187 F.Supp. 702 (SDNY 1960), are distinguishable on this ground; in *Pierson* itself the difference

between the rule for judges and prosecutors and the rule for police officers is apparent.

It has become increasingly apparent that the persistent violation of Acts of Congress by officers entitled to plead immunity from personal liability for their acts has created exceedingly tense confrontations and some questioning throughout the nation. The thoroughly sound doctrine of Spalding v. Vilas, 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780 (1896), which granted immunity from civil suits for damages to the Postmaster-General of the United States when engaged in the discharge of his duties has been judicially extended in the succeeding 70 years to cloak less august functionaries who have successfully maintained that they, in the pursuit of their duties, have authority to exercise at least a modicum of discretion. It would seem to be a sign of a peculiar dislocation of official approach to official integrity to plead such an immunity when the discretion exercised is that of deliberately violating a clearly expressed Act of Congress. See Pugach v. Dollinger, 277 F.2d 739, 745 (Waterman, J., concurring opinion); United States ex rel. Graziano v. McMann, 275 F.2d 284, 286 (2 Cir. 1960) (Medina, J., concurring). And see also Lee v. Florida, supra 392 U.S. at 385–386, 88 S.Ct. 2096, 20 L.Ed.2d 1166, and Fanale v. Sheehy, 385 F.2d 866, 869 (2 Cir. 1967) (Feinberg, J., concurring).

provable damages occasioned to this plaintiff by their wiretapping activities. Compare Miller v. Stinnett, 257 F.2d 910 (10 Cir. 1958). To conclude otherwise would make a mockery of federal law and of the Supremacy Clause. Compare Hamm v. City of Rock Hill, 379 U.S. 306, 311, 85 S.Ct. 384, 13 L.Ed.2d 300 (1964).

It has been suggested that to allow civil damages against a public official who violated § 605 would put the official in an intolerable position because on the one hand his state law permits him to wiretap and to divulge in a criminal prosecution the conversations monitored, and on the other hand he is prohibited from intercepting and disclosing those conversations by federal law. See Simons v. O'Connor, 187 F.Supp. 702 (SDNY 1960). But the public official is not caught between two equally valid conflicting laws; he must uphold the valid federal laws despite any conflicting state laws to the contrary. His duty is perfectly clear. See McCulloch v. Maryland, supra.[11] And in this particular case the preempting supreme law antedated the state's interpositional constitutional provisions by over four years and the state implementing statute by eight years.

The district court also found that Trooper Reynolds did not violate Section 605 and could not be liable in this civil action. The ground for this holding was that Trooper Reynolds did not divulge or publish any intercepted communication. Again I believe the district court erred.

First, Trooper Reynolds did violate Section 605. He testified at Guido's trial that he was an expert in making wiretaps, that he had perfected hundreds of them, that he installed this tap, and that he had listened to one or two conversations after the installation. Section 605 proscribes the interception and the divulgence of the *mere existence* of a telephonic communication, 47 U.S.C. § 605, and Trooper Reynolds's actions clearly fall within the prohibition. Accordingly, I would reverse the district court's determination on this issue.

Second, even if Reynolds's contributions were not a violation of Section 605 his activation of the equipment was certainly a part of a common plan or design which culminated in a violation of Section 605. Reynolds read the wiretap order, knew he was tapping the wire of a suspected gambler, and knew that any incriminating conversations which the tap disclosed might eventually be divulged. It is therefore quite possible that Reyonlds was a joint tortfeasor, 1 Harper & James, Torts § 10.1, and consequently jointly and severally liable with Officer Wemple, but, as I have indicated, it is not necessary to reach this question.[12]

Having erroneously concluded that Officer Wemple should have the benefit

---

11. A further defense raised in favor of defendants Wemple and Reynolds is that of "superior orders." No matter what effect the disapproval of that defense at the Nuremberg war crimes trials might have in an American criminal prosecution today, it is surely obvious to all that in the context of tort law the defense has absolutely no merit. For instance, would the employee of a trucking company be deemed excused from liability if he were able to show that he was instructed by his supervisor to make a 180° turn of his truck illegally in the middle of a busy street near the truck terminal and that it was in the process of completing this maneuver that he was the cause of a serious accident by which occupants of a passing automobile were injured? Would it be material that he would have lost his job had he disobeyed his supervisor? The fact that he was following orders he received from his superior could make the trucking company liable on the theory of *respondeat superior*, but the incidental fact that the driver was following orders would not provide the driver with a defense. On this very point of officer liability, despite superior orders, there is a most interesting opinion by Chief Justice Marshall, who had been an officer in the Continental Army, see Little et al. v. Barreme et al., 2 Cranch 170, 6 U.S. 170, 2 L.Ed. 243 (1804).

12. Defendant Reynolds raises as a separate defense that inasmuch as the suit had not been brought in the New York State Court of Claims a statute of limitations had time-barred plaintiff's action.

of immunity, the district court never reached the question of the liability of the City of Schenectady. However, the question of its liability has been briefed by the City in this court, and I would reach the questions the City briefed. Contrary to the rule in most other states, see 18 McQuillin, Municipal Corporations 330–333 (3d ed.) in New York a municipality is liable for the damages suffered from tortious acts or omissions of police officers in the performance of governmental duties because municipal immunity has been abrogated by a state statute. See, e. g., Dunham v. Village of Canisteo, 303 N.Y. 498, 104 N.E.2d 872 (1952); Bernadine v. City of New York, 294 N.Y. 361, 365, 62 N.E.2d 604, 161 A.L.R. 364 (1945); McCrink v. City of New York, 296 N.Y. 99, 71 N.E.2d 419 (1947). The City maintained to us, as did the other appellants, that a violation of Section 605 to the damage of the one

whose privacy has been invaded does not give the damaged individual a cause of action; that as Officer Wemple was covered by the immunity from liability afforded quasi-judicial officers, that immunity barred any claim against the City; and that Officer Wemple wiretapped as the agent of the District Attorney and not as the City's police officer, and therefore the City had no "control" over Officer Wemple's conduct and thus cannot be held liable under ordinary principles of *respondeat superior*. I have disposed of the first two grounds earlier in this opinion, and these grounds are of no avail. As to the third, the proven fact is contrary to the City's representation. See footnote 9 supra. Therefore, I would hold the City of Schenectady liable with Officer Wemple.[13]

In any event, it appears to me that, regardless of any other contention in

---

His theory is that a suit against him, a State trooper, is, in effect, a suit against the state, and the two-year statute of limiations applicable to suits against the state in the Court of Claims should apply. But this action was brought against the trooper in person in which he is charged with a personal tortious act, and, especially in this context, where he was on loan to the City of Schenectady and he was acting pursuant to a wiretap order directed to the Schenectady police department, it is difficult to perceive how the suit can be held to be against the state.

13. It appears from the record that Wemple was assigned to the Special Services Squad of the Schenectady Police Department, also known as the "vice squad," and that this group worked very closely with the district attorney. It is the City's contention that this squad's wiretapping activity was under the direction and control of the district attorney. Because the district attorney is completely free from the supervision of the municipal government, the City suggests that the City had no control over Wemple's activities. The essential question is one of control, i. e., the right to order the doing of an act and also to prescribe the manner in which it is to be done. The City relies exclusively upon Zimmerman v. City of New York, 52 Misc.2d 797, 276 N.Y.S.2d 711 (Sup.Ct.N.Y.Co.1966) in which a person whose criminal conviction had been overturned by the New York Court of Appeals sued the City of

New York for damages for false arrest, false imprisonment, malicious prosecution and conspiracy allegedly caused by the district attorney and his assistants, including a city police officer assigned to the district attorney's office. The thrust of *Zimmerman* is that the district attorney is an independent operator over whom the City, by law, has no control; therefore, when its employee is working under the direction of the district attorney, the City has no control over that employee, 52 Misc.2d at 800, 276 N.Y.S.2d at 715–716. However, the exact activities of the police officer in *Zimmerman* are nowhere recited; the most that is there said is that the police officer was assigned to the district attorney and assisted the district attorney in the latter's duties. The facts in the present case do not bring it within the scope of *Zimmerman*. Even if *Zimmerman* were indistinguishable I would be disinclined to follow it, for I am unwilling to say that whatever is done by a police department in the investigation of crime is done pursuant to the direction and control of the district attorney and not of the City executive. The duty to investigate crime is a duty of the police department, historically its main duty, and the department functions as an arm of the municipal government; once the police have investigated crime and arrested those persons they believe to have committed them, thereby invoking the criminal process, it is the district attor-

this case, it is obvious that the judgment below should not have been a dismissal of the plaintiff's suit but, at the very least, a judgment for the plaintiff awarding him, if nothing more, the nominal damages the intrusion into his privacy entitles him to have recovered.

ney's duty to prosecute those persons. See N.Y. County Law, McKinney's Consol. Laws, c. 11, § 700.

Although the former district attorney testified before the U. S. District Court that he was *directing* the "vice squad" in a gambling clean-up in Schenectady, the facts as they came out at plaintiff's criminal trial bespeak otherwise. At the criminal trial the testimony of Captain Morris and of other members of the "vice squad" was that the members of the squad had frequent meetings at which they discussed their means of surveillance and other strategy. It appears that Captain Morris occasionally consulted with the district attorney, but nowhere does it appear that the district attorney instructed the captain as to how surveillance was to be conducted. Although Captain Morris often participated in surveillance and raids, it appears that the district attorney never did. The district attorney did assist Captain Morris in preparing his affidavit supporting the application for the wiretap order, but this is explainable on the theory that the district attorney is the legal officer with the closest relationship to the police department. On the very question of the wiretap authorization, which is most important in determining who had control

with respect to the wiretap itself, it is significant that the wiretap order was directed to Captain Morris and his agents, not to the district attorney and his agents, though under state law it might have been directed to the district attorney. N.Y.Code Crim.Proc. § 813–a. Moreover, the trial court itself found that Wemple had been directed by the Chief of Police to reveal the intercepted conversations. There is no evidence that Wemple himself ever had any contact with the district attorney.

I conclude, therefore, that Wemple was "controlled" by Captain Morris, who in turn was his own man, carrying on the investigative function of the police department, an organ of the executive department of the municipality. As any good police official does, Captain Morris understandably consulted with the district attorney; however, in no way was Captain Morris told how to do his job by the district attorney. Indeed, see footnote 9 supra, the affidavit of Captain Morris which he filed when he sought the search warrant demonstrates on its face how frivolous this effort was to separate the Police Captain and his Special Service Squad from the Police Department.